DAVID C. BROWNSTEIN (SBN: 141929)
DAVID M. GOLDSTEIN (SBN: 142334)
**FARMER BROWNSTEIN JAEGER GOLDSTEIN SIEGEL & SHEPARD LLP**
155 Montgomery Street, Suite 301
San Francisco, CA 94104
Telephone: (415) 962-2873
dbrownstein@fbjgss.com
dgoldstein@fbjgss.com

KELLIE LERNER (*pro hac vice* to be filed)
ELLISON A. SNIDER (*pro hac vice* to be filed)
BENJAMIN B. ALLEN (*pro hac vice* to be filed)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
Telephone: (646) 960-8601
kellie@scl-llp.com
esnider@scl-llp.com
ballen@scl-llp.com

J. WYATT FORE (*pro hac vice* to be filed)
**SHINDER CANTOR LERNER LLP**
600 14th Street, NW
Washington, D.C. 20005
Telephone: (646) 960-8632
wyatt@scl-llp.com

N. SLADE BOND II (*pro hac vice* to be filed)
CHARLES J. LADUCA (*pro hac vice* to be filed)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
2445 M Street, NW Suite 740
Washington, D.C. 20037
Telephone: (202) 789-3960
sbond@cuneolaw.com

SARAH ROONEY (*pro hac vice* to be filed)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
8705 Colesville Road
B. 133
Silver Spring, MD 20910
Telephone: (301) 518-7428
srooney@cuneolaw.com

MATTHEW J. PLATKIN (*pro hac vice* to be filed)
AARON HAIER (*pro hac vice* to be filed)
**PLATKIN LLP**
413 Washington Avenue, Unit 174
Belleville, NJ 07109
Telephone: (973) 561-1951
mplatkin@platkinllp.com

*Attorneys for Plaintiffs the Writers Guild of America, West, Inc., and the Writers Guild of America East, Inc.*

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WRITERS GUILD OF AMERICA, WEST, INC., and WRITERS GUILD OF AMERICA EAST, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> PARAMOUNT SKYDANCE CORPORATION, and WARNER BROS. DISCOVERY, INC., <br><br> Defendants. | Case No. <br><br> **COMPLAINT** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

JURISDICTION AND VENUE ..........................................................................................7

THE PARTIES.....................................................................................................................7

BACKGROUND .................................................................................................................8

    A.    Film Production and Distribution ..................................................................8

    B.    Television Production and Distribution .........................................................9

    C.    Writers' Employment and Compensation....................................................11

        1.    Screenwriters' Compensation .........................................................12

        2.    Television Writers' Compensation ..................................................12

        3.    Residuals .........................................................................................15

    D.    Vertical Integration in Film and Television Studios....................................15

        1.    Film Studios.....................................................................................16

        2.    Television Studios............................................................................19

    E.    The Leading Studios Consolidate into the Major Film and Major Television Studios ................................................................................................................21

    F.    The Proposed Paramount-Warner Bros. Merger .........................................25

RELEVANT MARKETS ...................................................................................................26

    A.    Writing Services for WGA-Covered Anticipated Top Grossing Films Is a Relevant Market................................................................................................27

    B.    Writing Services for Episodic Television Shows Is a Relevant Market...................28

    C.    Writing Services of Writers Under Overall Deals Is a Relevant Market...................30

    D.    The Relevant Geographic Market Is the United States................................32

    E.    Barriers to Entry..........................................................................................32

ANTICOMPETITIVE EFFECTS......................................................................................34

    A.    The Transaction Will Substantially Lessen Competition in Each Relevant Market .38

        1.    All Screenwriters of WGA-Covered Anticipated Top Grossing Films.........39

        2.    All Episodic Television Writers on WGA-Covered Projects .......................40

        3.    Overall Deal Writers.................................................................................40

B.      The Transaction Will Lead to Lower Wages for Writers ..........................................41

C.      The Merger Will Reduce the Quantity, Variety, and Quality of Creative Works .....43

D.      The Merger Will Increase the Likelihood of Coordination ....................................45

NO PROCOMPETITIVE EFFECTS OR MERGER-SPECIFIC EFFICIENCIES JUSTIFY THE PROPOSED TRANSACTION ..........................................................................................................47

ANTITRUST INJURY AND HARM TO PLAINTIFFS ................................................................48

CLAIM FOR RELIEF .....................................................................................................................49

PRAYER FOR RELIEF...................................................................................................................50

Plaintiffs the Writers Guild of America, West, Inc. ("WGAW") and the Writers Guild of America East, Inc. ("WGAE," and collectively with the WGAW, "the WGA") bring this action against Defendants Paramount Skydance Corporation ("Paramount") and Warner Bros. Discovery, Inc. ("Warner Bros.") for violations of federal antitrust law. The WGA alleges, based upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Film and television writers bring this action to stop the proposed merger of Paramount and its rival Warner Bros. Paramount and Warner Bros. are two of the largest vertically integrated film and television studios. If Paramount succeeds in buying Warner Bros., the merged firm will be the largest buyer of original film and television programming in the United States, eliminating vigorous competition from a major film and television studio that has operated for more than a century. The proposed Paramount-Warner Bros. merger ("Merger") threatens the economic and creative health of the American entertainment industry. The Merger would eliminate competition for buying film and television writing, resulting in suppressed compensation, worse deal terms, and reduced programming volume and diversity. The merger must be blocked.

2.      The antitrust laws promote free market competition to protect consumers, workers, and the broader public from the abuse of concentrated economic power. Merger enforcement, pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, is a critical tool to protect competition before any antitrust harm takes hold.[1] Merger enforcement extends with full force to labor markets. When buyers of creative labor compete vigorously, writers command higher wages, better contractual terms, and more creative freedom.

3.      If successful, Paramount's Merger with Warner Bros. would create, by far, the most dominant studio in the American feature film industry. Today, the theatrical film industry is dominated by just five major studios: Disney, NBCUniversal, Sony, Paramount, and Warner Bros.

---

[1]      Congress mandates "that tendencies toward concentration in industry are to be curbed in their incipiency," before consolidation renders anticompetitive harm irreversible. *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 346 (1962).

(collectively "Major Film Studios"). In addition to purchasing and producing writers' work, the Major Film Studios support the development, financing, production, marketing, and distribution of such film projects across the United States, and operate complex studio lots with soundstages and backlots where films and television series are created.

4.　　These same studios also maintain in-house or closely affiliated post-production facilities, and command global marketing and distribution capacity capable of launching a film simultaneously on thousands of screens. This end-to-end capability, controlling both the production entity that greenlights a project and the distribution through which it reaches audiences, cannot be replicated by independent producers or smaller studios that primarily depend on third parties for financing and distribution.

5.　　Paramount and Warner Bros. are among four of the Major Film Studios (Disney, NBCUniversal, Paramount, and Warner Bros.) that are entirely vertically integrated and can deliver films to large audiences through major internal distribution channels. Each of these studios can distribute its produced films to large audiences through wide theatrical releases on thousands of movie screens nationwide simultaneously and benefit, as major streaming platforms, from affiliated access to premier theatrical products. Sony lacks a proprietary full-scale streaming platform; Sony's Crunchyroll platform distributes exclusively anime projects, primarily produced outside the U.S. Nonetheless, Sony retains broad distribution access for wide theatrical releases, extensively licenses its programming to third-party platforms and networks, and owns Alamo Drafthouse movie theaters.

6.　　These services are not interchangeable with smaller production companies or independent studios that lack the infrastructure to fully finance and distribute anticipated top grossing films themselves. And further consolidation among the Major Film Studios reduces competition for screenwriters by firms with end-to-end production and distribution capabilities, putting downward pressure on the economic and creative opportunities available to film writers.

7.　　In television,[2] seven major studios compete for writing talent: Disney, NBCUniversal,

---

[2]　　Unless otherwise specified, "television" here refers to both episodic series made for linear television networks such as ABC and episodic series made for streaming services such as Paramount+.

2

Paramount, Warner Bros., Netflix Studios ("Netflix"), Apple Studios ("Apple"), and Amazon MGM ("Amazon") (collectively "Major Television Studios"). Unlike film, where distribution turns on the wide theatrical release, Major Television Studios produce programming—including series made for television and series made for streaming—and distribute that programming primarily through affiliated streaming platforms, cable channels, and broadcast networks. Each of the Major Television Studios commissions original series, enters overall deals with writers, and actively bids against one another for the same pool of writing talent.

8.      Paramount and Warner Bros. compete directly in various film and episodic television markets today. They bid against one another to acquire projects and talent. They compete to distribute films to theaters, to produce and sell television programming to broadcasting as well as streaming platforms, and to license programming for reuse, including on their affiliated streaming platforms, cable networks, and pay television services. This rivalry has direct and material consequences for film and television writers. When leading studios compete for the same projects and talent, writers benefit: compensation rises and writers have more leverage to negotiate the terms of their work. More buyers in the market means more opportunities to pitch riskier original projects and receive competing offers on both commissioned scripts and "spec scripts"—scripts a writer has written without being employed to do so, and which a writer hopes to take to market and sell to a studio. It also means that each studio is less able to dictate one-sided terms that reduce writer compensation. In addition, greater competition between leading studios' affiliated streamers constrains prices for consumers and prevents any one studio from dictating how (and what) programming is created and distributed.

9.      By combining two of the Major Film and Major Television Studios, the proposed merger threatens to substantially lessen competition for film and television writers' services in the American entertainment industry. Under long-established Supreme Court precedent, a merger yielding a post-merger market share exceeding 30% is presumptively anticompetitive.[3] And under the 2023 Merger Guidelines, a merger that produces a Herfindahl-Hirschman Index ("HHI")

---

[3]      *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 364 (1963).

3

concentration level of more than 1,800 and increases concentration by more than 100 HHI is likewise presumptively anticompetitive.[4] The Paramount-Warner Bros. combined entity would command a market share in excess of 30% across several relevant markets for film and television writers' services, and result in HHI levels above the thresholds set by the guidelines.

10.    Recent experience shows that the harm the proposed Merger threatens to writers is not speculative. When Disney acquired 21st Century Fox ("Fox") in 2019, it combined two major studios, bringing franchises like Marvel, X-Men, Star Wars, and The Simpsons, along with networks and platforms like FX, Hulu, Disney+, ABC, among others, under one roof. Though the combined Disney-Fox entity maintains some nominally separate outlets, upon information and belief, it is widely understood that those outlets do not earnestly compete with one another for programming—and writers have responded accordingly, no longer treating them as distinct buyers.

11.    With fewer competitors, the merged Paramount-Warner Bros. entity would have both the incentive and the ability to lower costs by suppressing writers' wages and reducing output. Writers will be paid less and have fewer employment opportunities.

12.    Less competition will also reshape what gets made and silence underrepresented voices. As concentration increases, studios have stronger incentives to consolidate resources on a smaller number of lower-risk, higher-return productions, especially franchise-driven films and television shows, which are designed for maximum commercial reach. By contrast, competition fosters outlier voices by creating incentives for studios to distinguish themselves through unconventional, original, or underrepresented stories rather than converging on the lowest-risk projects.

13.    The vertical integration of the merged Paramount-Warner Bros. entity would exacerbate this competitive harm. In television, a vertically integrated business generally distributes series produced by its studio on a streaming service or other platform owned by the same parent company rather than seeking to sell its self-produced series to unaffiliated distributors or purchasing

---

[4]    U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 2.1 (2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf (*hereinafter* "2023 Merger Guidelines").

4

series from other studios on an open market. In this environment, if a project is rejected by the vertically integrated firm, the writer who created the project can lose access to an entire distribution ecosystem. A rejection by the merged Paramount-Warner Bros. would deny access to not only Paramount Pictures or Warner Bros., but also their other critical distribution channels: Paramount+, HBO Max, and an extensive constellation of affiliated platforms.[5] This powerful "walled garden" effect means that when a vertically integrated studio passes on a series creator's project—or when the writer wishes to walk away from unfavorable deal terms—the writer may be effectively foreclosed from distribution as well.

14.    A federal court recently recognized that consolidation among the buyers that employ creative talent would harm the creators they hire. The proposed merger between two of the "Big Five" U.S. book publishers, Penguin Random House and Simon & Schuster, was blocked on the grounds that the combined entity would have dominated the market for buying top commercial books, depressing author advances and reducing the number of titles released.[6] This logic applies with equal force here. The proposed Merger would reduce competition between buyers of film and television writing services, suppressing writers' compensation, eroding deal terms, and diminishing the volume and diversity of programming reaching audiences.

15.    There are no procompetitive justifications for the proposed Merger. The transaction's core features undermine any claim that it will promote streaming scale, generate meaningful cost synergies, or support a promised 30-film annual theatrical slate. The merged entity would carry approximately $79 billion in debt, creating powerful pressure to cut costs rather than expand output. The likely result is not renewed investment in Hollywood, but mass layoffs and programming reductions that would hollow out the very industry the deal purports to strengthen.

16.    Recent history confirms this risk. The 2022 Warner Bros.-Discovery merger was

---

[5]    Warner Bros. is also affiliated with the Discovery+ streaming platform, as well as the following cable brands: HBO, TNT, TBS, truTV, OWN (Oprah Winfrey Network), Cartoon Network, and Cinemax, among others. Paramount is affiliated with Pluto TV, BET+, and SkyShowtime streaming services, and the following broadcast networks and cable brands: CBS, MTV (and its affiliated brands), Nickelodeon (and its affiliated brands), Comedy Central, TV Land, Paramount Network, BET (and its affiliated brands), and Showtime, among others.
[6]    *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 56 (D.D.C. 2022).

5

justified by nearly identical promises of scale and synergy, yet it produced billions in write-downs, thousands of layoffs, and diminished programming as numerous projects were canceled, including completed films and series that were never released. Paramount-Skydance was the same story: following the 2025 merger, the combined company implemented a $2 billion cost-cutting plan which involved eliminating around 10% of its workforce and abandoning active programs as well as projects in development.[7] Scale achieved through consolidation is not the same as scale achieved through growth. A debt-laden combined entity would have less—not more—capacity to invest in the high-quality programming that drives consumer engagement. In short, the merged entity's promised synergies would amount to cost cuts to satisfy Wall Street, accompanied by reduced output, industrywide job losses, and a more concentrated market with fewer buyers competing for creative talent.

17.    The Clayton Act was designed to stop this kind of concentration—mergers that may substantially lessen competition—before it happens. The challenged Merger threatens to forge a cultural monolith and shrink the marketplace of ideas through corporate concentration. Film and television are the primary means through which American culture tells original stories about itself and contests ideas about who we are and what we value. When a handful of executives control which stories are financed, whose voices are platformed, and which programming reaches an audience, they exercise a form of economic and cultural power that the antitrust laws were designed to restrain.

18.    The Merger violates Section 7 of the Clayton Act for three independent reasons: it eliminates direct competition among major film and television studios, increases concentration in already concentrated markets, and creates conditions for both unilateral and coordinated anticompetitive harm. For those reasons, the Merger should be blocked.

---

[7]    Paramount Skydance Corp., Form 8-K (Feb. 25, 2026); Benjamin Mullin, *Paramount to Lay Off 2,000 Employees*, The New York Times (Oct. 29, 2005), https://www.nytimes.com/2025/10/29/business/media/paramount-layoffs-skydance.html; Pamela McClintock, *Feelings Don't Matter: How the Ellison Era is Transforming Paramount*, The Hollywood Reporter (Dec. 4, 2025), https://www.hollywoodreporter.com/business/business-news/paramount-plans-ninja-turtles-south-park-1236439954/.

6

**JURISDICTION AND VENUE**

19.     Defendants are subject to the personal jurisdiction of this Court pursuant to 15 U.S.C. § 22 and Federal Rule of Civil Procedure 4(k) and because each Defendant transacts business in, has purposeful, continuous, and/or systematic contacts with, and has sufficient minimum contacts in California and within this District.

20.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).

21.     This Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. § 26; 28 U.S.C. § 1331; and 28 U.S.C. § 1337(a).

**THE PARTIES**

22.     Plaintiff Writers Guild of America, West, Inc.  is a labor union representing approximately 11,000 professional writers who write literary material for television shows, movies, news programs, documentaries, animation, and new media. The WGAW's membership includes television and film writers in each relevant market. The WGAW is a California nonprofit corporation headquartered in Los Angeles, California. The WGAW's members are employed by subsidiary companies of both Paramount and Warner Bros.

23.     Plaintiff Writers Guild of America East, Inc. is a labor union representing approximately 7,000 professional writers who write literary material for television shows, movies, news programs, documentaries, animation, and new media. The WGAE's membership includes television and film writers in each relevant market. The WGAE is a nonprofit corporation headquartered in New York, New York. The WGAE's members are employed by subsidiary companies of both Paramount and Warner Bros.

24.     Defendant Paramount Skydance Corporation ("Paramount") is a Delaware corporation with its worldwide headquarters in New York, New York. The corporation owns and operates other major entertainment brands, such as CBS Entertainment Group (including CBS Broadcasting and CBS Studios), Paramount+, Showtime, Nickelodeon, MTV, BET, and Comedy Central. In 2025, Paramount reported nearly $29 billion in revenue.

7

25.    Defendant Warner Bros. Discovery, Inc. ("Warner Bros.") is a Delaware corporation with its worldwide headquarters in New York, New York. Warner Bros. owns and operates a broad portfolio of major entertainment brands, including HBO, HBO Max, and Cartoon Network, and has a majority ownership interest in OWN (Oprah Winfrey Network). In 2025, Warner Bros. reported over $37 billion in revenue.

**BACKGROUND**

### A. Film Production and Distribution

26.    After a film writer develops a script for a studio—whether by selling a spec screenplay, pitching an idea the studio then commissions to be written as a screenplay, or being hired to adapt optioned material such as a novel—the project can move into production.

27.    Film production is a capital-intensive, infrastructure-dependent enterprise. A film project turns on the greenlight: an institutional decision made by a small number of executives who control significant financial resources. That greenlight activates the studio's production process, which includes principal photography (including the mobilization of various crafts and infrastructure, such as soundstages, backlots, and equipment) and the post-production stage of editing, visual effects, and sound mixing to transform raw footage into a releasable, exhibition-ready product.

28.    After production, distribution is the process by which films reach their target audiences. For the Major Film Studios, film distribution for anticipated top grossing films commonly culminates in a wide theatrical release: a coordinated national rollout in which these films open nationwide on thousands of screens. This distribution requires deep relationships with theatrical exhibitors, the ability to commit substantial marketing resources in advance, and the logistical coordination to deliver advertising and promotional support across the entire country at once. A wide release for an anticipated top grossing film is an industry event, one that only the Major Film Studios (with their highly vertically integrated businesses) can consistently execute. In the opening weeks of a wide release, multiplexes are saturated with a single title, often occupying multiple screens and premium formats, and supported by significant marketing budget.

8

29.    By contrast, films from small, independent studios traditionally follow a different path. Without the distribution infrastructure to support a true wide release, these films typically open in limited exhibition, for example debuting on a handful of screens in select markets, often New York or Los Angeles. From there, they hope to expand gradually, building momentum through critical reception, word of mouth, and audience response.

30.    Films distributed directly through a streaming service represent yet another distinct approach. These films are released for viewing to the subscribers of the streaming service, often without any theatrical release at all or a limited release to qualify for film awards. Like small, independent films, these projects also depend on different levels and styles of marketing. As a result, anticipated top grossing theatrical films are a distinct product within the industry, shaping both the marketplace and the cultural conversation in real time. For film writers, this release pattern preserves greater possibility of writer participation in the financial success of the project through residuals and potential profit participation, compared with the Netflix model of exclusive global streaming releases.

## B. Television Production and Distribution

31.    Television writers are typically involved across the entire lifecycle of a series. The writing of a series is organized around the writers' room: a staffed creative unit, led by a head writer called a showrunner, responsible for forming the story, writing scripts, and maintaining the creative voice of a series. The studio has final say as to whether a show gets made at all, as well as how many writers are hired, at what level, and for how long. It is common for writers to perform writing services throughout the production of a series.

32.    Today's Major Television Studios are largely vertically integrated across the television supply chain. Disney, NBCUniversal, Paramount, and Warner Bros. own or control broadcast networks, cable channels, and proprietary streaming platforms, while Amazon, Netflix, and Apple operate primarily through proprietary streaming platforms. Each of these distribution channels functions as a captive pipeline for the studio's own programming.

33.    When vertically integrated, a studio's production arm and its distribution arm are parts

9

of the same economic enterprise, creating structural incentives that favor in-house programming, foreclose third-party producers, and exert downward pressure on creators' compensation who lack access to any equivalent distribution alternative.

34. For major studios like Paramount and Warner Bros., this form of self-dealing has become central to the vertically integrated business model. For example, in earnings calls with investors, Paramount's former President, CEO & Director Robert Marc Bakish said: "What we're going to do is we're going to put the first season of *Tulsa* on CBS prior to the second season of *Tulsa* dropping on Paramount+, really using it as a broad marketing engine."[8]

35. Warner Bros. agrees: "this asset[, an expansive film and television library,] offers a wealth opportunity in terms of feeding our own platforms as well as others. It's a mainstay of our business to create great content and window it through, creating value in each window. And as you would expect, a lot of analysis and strategic discussion goes into these discussions. In some cases, ***we'll want to keep premium content exclusively on our platform for a very long time***."[9]

36. When a studio controls both production and distribution, a single decision can also foreclose a creator's access to that entire studio's vast distribution network.

37. If a writer's project is rejected by a Major Television Studio, that writer may also be simultaneously foreclosed from that studio's broadcast networks, cable channels, and proprietary streaming platforms. In the case of a merged Paramount-Warner Bros. studio, that would include foreclosure from Paramount+, HBO Max, and every other affiliated platform.

38. Vertical integration also enables the exercise of monopsony power through self-dealing. Under the WGA collective bargaining agreement, the Theatrical and Television Basic Agreement (commonly known as the "Minimum Basic Agreement" or "MBA"), writers are entitled to residual compensation when projects they have written are reused, and for numerous reuse markets the residual is calculated as a percentage of revenue received by the studio. However, when

---

[8] Paramount Global, Q4 2023 Earnings Call Tr. at 12, Feb. 28, 2024, https://ir.paramount.com/static-files/d626ef32-dbe3-429a-ae2c-1ca6652163a4.

[9] Warner Bros. Discovery, Inc., Q2 2023 Earnings Call Tr., Aug. 3, 2023, https://finance.yahoo.com/news/warner-bros-discovery-inc-nasdaq-185517241.html (emphasis added).

COMPLAINT
Case No.

a producer is licensing programming to, for instance, its own affiliated streaming service, the company can underpay itself in order to depress residual compensation.

39. The WGA has had to expend substantial resources to challenge the appropriateness of imputed license fees set by affiliated parties. In one instance, a $3.4 million settlement resulted from a WGA claim brought by the WGAW against Paramount subsidiary CBS for undervaluing imputed license fees for programming available on CBS All Access (the predecessor platform to Paramount+),[10] and in another example Netflix paid out $42 million in unpaid residual compensation to hundreds of screenwriters after Netflix had systematically "negotiated" artificially low license fees with itself on more than one hundred original feature-length projects.[11]

40. These examples illustrate how vertical integration enables monopsony power, which is demonstrated by reductions in arms-length negotiations between producers and distributors. This is the predictable result of a structure in which a single corporate family controls both the seller (the producer of the show) and buyer (the distribution channel, e.g., streaming) of films and series.

## C. Writers' Employment and Compensation

41. Film and television writers are typically freelance employees in an industry characterized by constant job searching, irregular demand, lack of pay transparency, and low job availability exacerbated further by genre specialization.

42. The characteristics of television writer compensation are distinct and separate from the characteristics of screenwriter compensation.

43. WGA writers secure work under the MBA which, among other things, establishes minimum compensation for writing services and deferred compensation—residuals—for reuse of credited writers' work in secondary markets. Writers are free to negotiate individually for "overscale" compensation above MBA minimums. The MBA minimums for television writers differ qualitatively from those for film screenwriters, as more fully described herein.

---

[10] Cynthia Littleton, *WGA Sets $3.4 Million Settlement With CBS for All Access Streaming Residuals*, Variety (Apr. 15, 2021), https://variety.com/2021/tv/news/wga-cbs-streaming-settlement-all-access-1234952956/.

[11] David Robb, *WGA Wins $42 Million "Self-Dealing" Arbitration*, Deadline (Aug. 4, 2022), https://deadline.com/2022/08/wga-wins-netflix-arbitation-multimillion-dollar-case-over-self-dealing-1235085371/.

11

### 1. Screenwriters' Compensation

44. Feature film writers—screenwriters—are compensated almost exclusively by script fees rather than weekly fees for writing services. Script fees are typically contracted around one or more defined "writing steps" such as a first draft, rewrite, or a polish.

45. A screenwriter may also write a script "on spec"—not under employment or for a specific studio—and later sell it to a buyer, with or without being engaged to perform additional writing services.

46. The MBA establishes minimum compensation for screenwriters at each writing step. Minimum rates vary depending on whether the material is original to the writer or adapted from source material.

47. Under the MBA, an employer is not required to share any portion of box office revenues with a screenwriter when a film receives a theatrical release; however, writers may negotiate contingent compensation tied to box office performance or writing credit, in addition to profit participation in which the writer shares in the profit generated by the film.

### 2. Television Writers' Compensation

48. Television writers' initial compensation generally falls into two categories: (1) script fees for writing stories and/or teleplays for individual episodes of a series; and (2) weekly or per episode fees for performing writing services on a series. For a writer employed on a television series, it is common for the writer to be paid both one or more script fees as well as weekly or per episode fees. The MBA establishes minimum rates for both script fees and weekly services on a television series.

49. A "pilot" is the first episode of a television series; it establishes the show's core premise. Pilot script fees are generally paid above MBA minimums and are determined by a writer's quote, episode length, and the intended market, such as broadcast or streaming, as well as whether there was competitive bidding for the project between studios.

50. A studio generally decides to greenlight (i.e., to produce the show) after a pilot script has been written. In the ordinary course, once there has been a greenlight, a writers' room is

12

convened. The MBA sets minimum staffing levels for writers' rooms depending on the episode order. For example, if 10 episodes are ordered, at least five writers must be hired in the writers' room; generally, more writers are hired to work in the writers' room than the minimum staffing levels required by the MBA.

51.    The MBA sets the minimum weekly compensation for a writer employed to perform writing services on a television series. Such minimum weekly compensation varies based on the television writers' job title/classification. A writer compensated on a per episode basis (e.g., $40,000 per episode) must be paid no less than the MBA weekly minimum fee for each week they perform writing services; accordingly, the MBA weekly minimum fee regulates how a per episode fee can be amortized over a period of weeks of employment by the studio.

52.    The ladder of television writer titles, ranging from least experienced to most experienced, is typically Staff Writer, Story Editor, Executive Story Editor, Co-Producer, Producer, Supervising Producer, Co-Executive Producer, and Executive Producer.

53.    Early career writers—Staff Writers, Story Editors, and Executive Story Editors—are normally paid at or close to MBA weekly minimums. As television writers gain experience, they may have the individual leverage to negotiate weekly rates above weekly MBA minimums. The most experienced writers on a series hold titles such as Co-Executive Producer or Executive Producer. Each series also has at least one showrunner (an Executive Producer), who is the writer responsible for overseeing the show's development and production.

54.    A critical term of any television writing contract is whether the guaranteed compensation is structured as a per week rate or per episode rate. It is more common for more experienced writers, such as Co-Executive Producers or Executive Producers, to be compensated on a per episode basis.

55.    Another key contract provision of any television writing contract is the guaranteed length of employment. For writers paid at a weekly rate, the employment duration directly determines their total guaranteed compensation. For writers paid on an episodic-fee basis, contract terms may specify the period of work covered by the fee.

13

56.    Television writers can also be compensated through "overall deals." The most established, high-profile television writers often enter overall deals with a studio for exclusive access to the writer's development and work on television projects for a set period. The pool of potential employers is significantly smaller for writers at this level.

57.    Overall deal terms typically include guaranteed compensation; contingent compensation, such as additional fees contingent on a project being greenlit or profit participation based on the profit generated by a series; term length; pitch rights if the studio passes on a project; and whether the studio provides the writer support staff.

58.    Consolidation of buyers competing for top writer talent has contracted the overall deal market. Television showrunner, writer, and producer Michael Schur, whose credits include *Saturday Night Live*, *The Office*, *Parks & Recreation*, and *The Good Place* noted, "Overall deals are, at their core, a competitive instrument. Previously, if a studio did not secure a writer with an overall deal, the writer, actively employed by one studio as a writer on staff, could walk across the street and develop a new show for a competitor. As consolidation has reduced the number of independent buyers and vertical integration has made cross-company sales increasingly rare, that competitive threat has materially weakened. The result is a market in which overall deals are offered less frequently, to fewer writers, on shorter terms, and at lower guaranteed compensation. This is at least in part because the competitive pressure that once incentivized studios to pay for exclusivity has been replaced by a market in which exclusivity is in effect already guaranteed by the consolidation itself, not because the work writers provide has become less valuable."

59.    Smaller and mid-size studios often cannot afford overall deals, which routinely provide compensation exceeding $1 million per year. Every Major Television Studio employs writers under overall deals, with variation by studio and genre, which further narrows the creative opportunities available to writers.

60.    The proliferation of streaming has materially degraded television writers' employment terms. Without the fixed release calendar of linear television, the gap between when a show is written and when it enters production has lengthened significantly. The result is fewer

14

writers employed per series, increased workloads for those who are hired, and fewer episodes that, particularly for the head writers known as showrunners, nonetheless stretch compensation in the form of episodic fees over more weeks of work. These conditions are likely to worsen with a new merged Major Television Studio with unprecedented power over the labor market.

### 3. Residuals

61.    The MBA establishes a process for determining writing credit on feature films and television episodes. Writers who receive credit are entitled to "residuals" under the MBA, which are payments triggered when produced works (such as a film or television episode) are exhibited in secondary distribution markets.[12]

62.    When the producing entity and distribution platform are unaffiliated, they engage in an arms-length transaction to determine the value of the licensed project; credited writers sometimes receive a share of license fee revenues according to a formula established by the MBA. When the producing entity and distribution platform are commonly owned, as with the Major Film Studios (other than Sony) and Major Television Studios, however, related entities may attempt to set artificially low license fees to depress residual payments owed to writers. The MBA expressly addresses this risk by requiring that commonly owned entities impute a license fee based on comparable arms-length transactions between unaffiliated entities. Under the MBA, the WGA can challenge the appropriateness of imputed license fees set by affiliated parties.

### D. Vertical Integration in Film and Television Studios

63.    Today, both film and television are dominated by highly vertically integrated studios like Paramount and Warner Bros., which control every aspect of a project's lifecycle. A studio's level of integration and preferred distribution to viewers have significant consequences for writers and broader competitive dynamics in both industries.

---

[12]    For example, the credited writers of a screenplay would be entitled to residual compensation if a film initially released in theaters was exhibited on a streaming platform. Residuals are paid either as a fixed dollar amount as set forth in the MBA or as a percentage of the revenue received by the producing entity for licensing the work.

15

### 1. *Film Studios*

64.    A vertically integrated studio that produces films can take a project from idea through final product without relying on outside entities for core functions. It can finance large-scale productions; employ thousands of workers across specialized crafts; coordinate complex logistics involving visual effects and soundstage engineering; and consistently launch nationwide theatrical releases. A vertically integrated film studio operates its own in-house global theatrical distribution entities, enabling it to directly negotiate terms with film theaters and giving it control over box office revenue shares. A vertically integrated studio can also use its large slate to cross-leverage titles against one another, conditioning access to an anticipated top grossing film on better terms for another title. This end-to-end capability allows them to operate at a scale and consistency that other production companies simply cannot replicate.

65.    Each Major Film Studio is meaningfully vertically integrated to varying degrees. Paramount, Warner Bros, Disney, and NBCUniversal are the only fully vertically integrated film studios in the industry. Sony lacks a proprietary full-scale streaming service but maintains broad theatrical distribution and licenses extensively to third-party platforms.

66.    Other major studios with some vertical integration with popular streaming platforms—Netflix, Amazon, and Apple—represent a different model from the Major Film Studios. For example, while Netflix is a significant producer and distributor of films, it combines the distribution and exhibition stages into a single direct-to-consumer subscription platform. In doing so, Netflix captures value only through monthly subscriber fees and advertising, and generally pursues limited theatrical release primarily for purposes of awards qualification. With few exceptions, Netflix films remain exclusive to Netflix, unlike films that pass through multiple secondary distribution windows such as premium cable, electronic sell-through, digital rental, and third-party subscription streaming.

67.    Similarly, Amazon has premiered some films in theaters, but it has predominantly released films straight to its streaming service or opted for limited theatrical releases before quickly moving films to its affiliated streaming services. To the extent that Amazon or subsidiaries have

widely released films in theaters, those are often films that were produced under MGM studios, which was acquired by Amazon in 2022. Historically, Amazon has only maintained a domestic theatrical distribution entity and so it must partner with larger film distributors like Warner Bros. and Sony for international distribution. Amazon recently launched an international film distribution division and has promised to premiere more films in theaters, but it remains to be seen if they will deliver on that promise. Amazon's track record of changing course in response to commercial realities is well-documented, from beefing up its free ad-supported streaming service, Freevee, only to shut it down a few years later, to its short-lived script competition that it promoted as a way to let new voices break into the industry.

68.    Meanwhile, Apple does not compete at scale with the Major Film Studios. Unlike the Major Film Studios, Apple lacks a proprietary theatrical distribution entity. Instead, it relies on third-party distributors, including some of the Major Film Studios, when it releases films theatrically. Apple also produces a substantially smaller annual slate of films.

69.    These popular streaming studios do not have the infrastructure or, seemingly, the interest in producing and consistently distributing films for theatrical release. According to Netflix's co-CEO: "Driving folks to a theater is just not our business. Having big new desirable content drives value for our members and drives value for our business. There are no major changes in play."[13]

70.    From many screenwriters' perspective, there are important distinctions between writing for a Major Film Studio and writing for a streaming-exclusive distributor like Netflix. Some screenwriters prefer the cultural impact of a theatrical release; the creators of *Crazy Rich Asians* chose a theatrical release with Warner Bros. over a significantly higher initial monetary offer to distribute through Netflix, recognizing that the cultural impact of the first film with an all-Asian ensemble cast from a major Hollywood studio since 1993 premiering in theaters would not be replicated by premiering on Netflix.[14] As screenwriter David Koepp, whose credits include *Spider-*

[13]    Pamela McClintock, *Netflix Co-CEO Ted Sarandos: "Driving Folks to a Theater is Just Not Our Business,"* The Hollywood Reporter (Apr. 18, 2023), https://www.hollywoodreporter.com/movies/movie-news/netflix-co-ceo-ted-sarandos-driving-folks-to-a-theater-is-just-not-our-business-1235391140/.
[14]    Rebecca Sun and Rebecca Ford, *The Stakes Are High for 'Crazy Rich Asians'—And That's the Point,* The Hollywood Reporter (Aug. 1, 2018),

17

*Man*, *Jurassic Park*, and *Mission: Impossible*, explains, "[A] film in wide theatrical release drives the conversation in a way that a streaming release simply does not. I have had one film go directly to streaming, and the experience confirmed what I had observed from the outside: a streaming release generates attention for perhaps a week, and then it vanishes. In contrast, a theatrical film that connects with audiences lingers. It remains in the conversation, which has value both creatively (the sense that you made something people actually absorbed and carried with them) and economically, because a film that stays in the cultural conversation generates the downstream revenue that funds a writer's long-term livelihood."

71.    In addition, a theatrical release structure preserves the possibility of sequential windowing, where the writer has opportunities for additional compensation through residuals earned as the film is distributed in different ways—theatrical release, home video, premium cable, television networks, and streaming platforms. Residuals for theatrical films generally take the form of a percentage of the project's revenue generated by reuse in secondary markets. In addition, individual writers may negotiate for profit participation, or a share of the project's profits from the box office and other revenues.

72.    In today's market, a studio's commitment to theatrical release can be key to reaching a deal, as in the case of *Siren Head*, to which Warner Bros. recently purchased the rights after a bidding war among the five Major Film Studios.[15]

73.    In contrast, Netflix produces films only for availability on Netflix's streaming platform, meaning that residuals are limited to a formula based on an imputed license fee for exhibition of the film on Netflix's streaming service. Profit participation exists only in the form of defined bonuses that limit writer participation in the upside of a successful project with Netflix.

74.    The chairman of Netflix's film division acknowledged the difference in these models from a screenwriter's perspective: "There is a group of filmmakers who still want theatrical. Those

https://www.hollywoodreporter.com/movies/movie-features/crazy-rich-asians-how-asian-rom-happened-netflix-1130965/.

[15]    Borys Kit, *'Siren Head' Horror Movie, Based on Internet Sensation, in the Works with Zach Cregger, Brian Duffield*, The Hollywood Reporter (July 1, 2026), https://www.hollywoodreporter.com/movies/movie-news/siren-head-horror-zach-cregger-brian-duffield-1236634292/.

18

are filmmakers that we've accepted we just won't work with."[16]

75. Small and independent production companies, such as A24 and Blumhouse, play a different role in the movie ecosystem. Although creatively influential, they do not own the extensive production infrastructure, in-house distribution, and marketing capacity for anticipated top grossing films, or the vast film and television libraries and broadcast and cable channels that characterize NBCUniversal, Disney, Paramount, and Warner Bros.

76. Small studios do not consistently widely release films at higher production budget tiers, particularly at $100 million in production budget and above. From 2021 to 2024, A24 widely released just two WGA-covered movies in theaters, and neither had a production budget over $100 million.

77. Independent studios' strength lies in curation and distinctive storytelling. But that alone is insufficient to deliver their product to America's audiences. They must partner with leading studios or other third parties for the financing, production services, and scaled distribution to release large-scale projects.

*2. Television Studios*

78. In scripted television series programming, Netflix, Apple, and Amazon purchase original series, offer overall deals, and compete in the same pool as Disney, NBCUniversal, Paramount, and Warner Bros. for writing talent.

79. Although Sony produces television and streaming series, it lacks the captive distribution infrastructure that defines the Major Television Studios' position in the labor market for television writing services and the market for series production. Unlike Disney, which distributes its programming through affiliated networks and services including ABC, Hulu, and Disney+; NBCUniversal, which supplies NBC and Peacock; Paramount, which programs CBS and Paramount+; and Warner Bros., which fills HBO, HBO Max, and its cable networks—Sony does not own any broadcast networks, cable channels, or popular streaming platforms to program, and,

[16] Nicole Sperling, *Netflix Is Done Coddling Hollywood*, The New York Times (June 4, 2026), https://www.nytimes.com/2026/06/04/business/media/dan-lin-netflix-hollywood.html?unlocked_article_code=1.n1A.Pd2U.MdddkCS6v4Oc&smid=url-share.

19

therefore, primarily distributes series through third parties. This distinction makes Sony fundamentally different from the Major Television Studios from the perspective of television writers trying to sell series.

80. Defendants do not consider Sony a competitor in television, where vertical integration between production and a major streaming service has become a necessary prerequisite to compete in both production and distribution. In their earnings calls with investors from 2023 through 2026, neither Paramount nor Warner Bros. ever identifies Sony or Columbia Pictures (a Sony subsidiary) as a competitive threat in television. Sony appears in the entire transcript record exactly twice: two passing references in Warner Bros. presentations to Sony as a third-party licensor supplying programming to the HBO Max platform in Latin America. Sony appeared, in other words, not as a rival but as a vendor.

81. By contrast, Paramount and Warner Bros. consistently and repeatedly identify the same entities as their actual competitors: Netflix, Disney, Amazon, Apple, and NBCUniversal. These names recur across dozens of earnings calls, analyst Q&A sessions, and investor conferences as the benchmarks against which Defendants measured streaming subscriber growth, programming investment, and strategic positioning. This occurs even when the companies' leadership mixes together streaming, theatrical release, film, and television. Sony is absent from the discussion in all of these segments.

82. Paramount's SEC filings make the point even more directly. In a Form DFAN14A filed with the Commission on December 8, 2025, in connection with this very transaction, Paramount justified the combination on the ground that it would "create a scaled, global streaming service to compete with Netflix, Amazon, and Disney."[17] Sony did not make the list.

83. Similarly, neither Lionsgate nor A24 effectively compete for television writing services against the Major Television Studios because neither controls a distribution platform of sufficient scale to guarantee writers meaningful distribution of their project. For example, Lionsgate

---

[17] Paramount Skydance Corp., Form DFAN14A, Additional proxy soliciting materials filed by non-management (Investor Presentation titled, "Paramount's $30 all-cash offer provides greater value and certainty to WBD shareholders"), Slide 15, Dec. 8, 2025, https://ir.paramount.com/static-files/2383b29f-d5c6-4328-bcd2-79fe295cb335.

20

and A24 have no distribution infrastructure at all, relying entirely on third-party platforms.

84.    The graphic below demonstrates the difference in television distribution between the Major Television Studios and other studios.



**E.  The Leading Studios Consolidate into the Major Film and Major Television Studios**

85.    In recent decades, America's entertainment industry has experienced unprecedented consolidation. Through a vast web of mergers and acquisitions, the industry has consolidated into a small number of powerful, multifaceted conglomerates.

86.    Despite the overwhelming array of names and brands in the American entertainment industry, ownership of programming and exhibition platforms can be traced back to the same handful of media conglomerates. DC Studios, Warner Bros. Television, HBO, and HBO Max are all Warner Bros. Marvel, FX, Disney+, and Hulu are Disney. Peacock, Focus Features, and NBC are Comcast, which owns NBCUniversal. Paramount+, CBS, Showtime, and Skydance are

21

Paramount. The brands are real, but their independence is not. What looks like a thriving, competitive marketplace is, in practice, a negotiation between the same few players—acquiring, merging, spinning off, and reacquiring the same libraries, the same franchises, and increasingly, the same talent.

87.　　The graphics below illustrate the concentration of media buyers of scripted film and television programming that would result from a merged Paramount-Warner Bros. entity, shown alongside the currently concentrated ownership footprints of every other major U.S. film and television brand.



*Partially Owned
**Theatrical Rights Only
***Under Exclusive Licensing Deal

22



*Partially Owned
**Theatrical Rights Only
***Under Exclusive Licensing Deal

23

88.    Much of this consolidation arose from the 1995 repeal of the Federal Communications Commission's "financial interest and syndication rules" (the "Fin-Syn Rules"), which prohibited television networks from owning the programming they broadcast or profiting from its syndication.

89.    Enacted in 1970, the Fin-Syn rules were designed to prevent the then-three major broadcast networks (ABC, CBS, and NBC) from leveraging their control over distribution to dominate series production as well.

90.    The Fin-Syn Rules required a structural separation between studios that produced television series and networks that distributed them, preserving competition in both markets.

91.    When the FCC repealed the Fin-Syn rules in 1995, that structural firewall was removed.

92.    Studios were then permitted to own the networks that carried their programming while retaining financial interests in the shows they aired. The result was a rapid wave of vertical integration: studios acquired broadcast networks and cable channels, and eventually expanded into streaming platforms, creating the highly consolidated entertainment conglomerates that exist today.

93.    Paramount and Warner Bros. emerged in their current form as a direct result of this long arc of consolidation: they bring together historic film studios, broadcast and cable networks, and direct-to-consumer streaming services.

94.    This consolidation has reshaped the balance of power within the industry. Whereas the 1920s to the 1940s were defined by eight leading studios, that number narrowed to six by the late 1990s, followed by two decades of vertical integration.

95.    For example, Disney began an acquisition spree in the late 1990s, beginning with its acquisition of ABC after the Fin-Syn rules were repealed. Between 2006 and 2012, the company then swallowed up three competing film and television studios: Pixar ($7.4 billion, 2006), Marvel Entertainment ($4 billion, 2009), and Lucasfilm ($4 billion, 2012). That landscape shifted again in 2019 when The Walt Disney Company acquired 21st Century Fox for $71 billion, and the leading studios were consolidated into five Major Film Studios. The deal meant fewer movies made for theaters, as well as a reduction in consumer choice.

96.    The current levels of concentration have already contributed to a focus on high-budget, blockbuster film franchises (the "tentpole strategy"), which enable studios to reduce innovative development and investment in original, mid-budget and creatively distinct films, as well as fewer films overall.

97.    The Disney-Fox merger illustrates how this consolidation harms writers. As David Koepp explains: "The practical consequence for screenwriters was immediate and categorical. Writers stopped submitting projects to Fox as had been our practice. Not because anyone issued a directive, but because the creative identity that made Fox a meaningful buyer had been absorbed into Disney's priorities. Disney's identity is clear: Lucasfilm, Marvel, Pixar, live-action remakes of animated films, and a small number of Fox legacy projects. An original adult thriller, a political drama, a mid-budget character study, none of those belong in Disney's creative program, and every working writer understands that. The buyer that Fox represented did not migrate to Disney. It disappeared."

**F.  The Proposed Paramount-Warner Bros. Merger**

98.    The proposed combination of Warner Bros. and Paramount, valued at $110.9 billion, represents one of the largest transactions in the history of entertainment.

99.    Together, the companies would unite two vast film and television libraries, two sprawling production infrastructures including soundstages, broadcast and cable networks, and competing streaming platforms under a single corporate umbrella.

100.   The sheer scale of the deal, combining billions in annual revenue, more than a century of intellectual property, and end-to-end production and distribution capabilities, would create an entity of unprecedented reach across film, television, and streaming.

101.   The value of the Paramount-Warner Bros. deal is enormous. The transaction has mixed consideration, with substantial stock and cash elements. To address the uncertainty of funding, Oracle co-founder Larry Ellison has provided an irrevocable personal guarantee of $40.4 billion to backstop equity financing.[18]

---

[18]    Lauren Thomas & Joe Flint, *Larry Ellison Provides Personal Guarantee for Paramount's Bid for Warner*, The Wall Street Journal (Dec. 22, 2025),

102. The deal also has other financing commitments, including bridge loans and equity contributions tied to Larry Ellison and his backers, which would help facilitate the acquisition and the post-merger restructuring. Additionally, the merged entity would be 49.5% foreign owned, with three sovereign wealth funds providing 38.5% of capital—nearly $24 billion—to complete the merger.[19]

103. This structure reflects the ambition of the transaction: to create a combined company to dominate entertainment across film, television, and streaming.

104. But the reliance on outside capital and leveraged financing creates significant post-deal repercussions for labor and consumers, as the new combined entity will face immense pressure to cut costs, reduce headcount, and narrow its programming slate to service debt obligations.

105. Paramount's Chairman and CEO, David Ellison, has already promised to find "synergies" from the Merger, leading to "fears of mass layoffs."[20]

106. The agreement includes a $7 billion break-up fee and a ticking fee of approximately $0.25 per share per quarter if the transaction is not closed by September 30, 2026.[21] In the aggregate, that amounts to $650 million per quarter in addition to the existing cash consideration. This mechanism is designed to deter competing bids, and to cause the parties to rush to close the deal.

## **RELEVANT MARKETS**

107. The proposed Merger is presumptively illegal because it will create a combined entity that exceeds the permitted concentration levels as recognized by antitrust law, indicating that the

---

https://www.wsj.com/business/deals/paramount-amends-bid-for-warner-discovery-with-new-ellison-guarantee-035b0ce8.

[19] Todd Spangler, *Paramount-Warner Bros. Discovery Will Be 35.5% Owned by Middle Eastern Funds Following Close: Filing*, Variety (Apr. 27, 2026), https://variety.com/2026/film/news/paramount-warner-bros-foreign-ownership-middle-eastern-funds-1236731732/.

[20] Samantha Masunaga, *Paramount-Warner Bros. Discovery deal stirs fears of mass layoffs*, L.A. Times (Mar. 3, 2026), https://www.latimes.com/entertainment-arts/business/newsletter/2026-03-03/wide-shot-warner-bros-discovery-paramount-jobs.

[21] Press Release, *Paramount Comments on Warner Bros. Discovery Board's Determination That Paramount Proposal Could Reasonably Be Expected to Lead to a Superior Proposal* (Feb. 24, 2026), https://ir.paramount.com/news-releases/news-release-details/paramount-comments-warner-bros-discovery-boards-determination.

26

Merger will substantially lessen competition across several relevant markets.

## A. Writing Services for WGA-Covered Anticipated Top Grossing Films Is a Relevant Market

108.  Writing services for WGA-covered anticipated top grossing films—those with budgets of $100 million or more—constitute a distinct category of creative labor that differs meaningfully from writing services for limited release, independent, or direct-to-streaming films.

109.  Screenwriters of anticipated top grossing films occupy a distinct tier within the broader writer labor market. They have a demonstrated capacity to execute the commercial, narrative, and tonal demands of projects designed to perform across thousands of screens simultaneously. The scale of that distribution commitment, which most often starts with a theatrical wide release, shapes every aspect of the writing assignment, from the scope of the creative brief to the compensation to the iterative rewrite process leading to production.

110.  That level of craft and industry credibility is not fungible with writers working in other formats. For many screenwriters, anticipated top grossing film projects offer compensation commensurate with the potential revenue of the project, both in terms of initial compensation and contingent compensation (including profit participation based on the profit the film generates); increased opportunities for substantial residual compensation for reuse of the film in secondary markets; as well as prestige and cultural impact. A writing credit on an anticipated top grossing film project is among the most valuable credentials in the industry, allowing the writer to command substantially higher fees on subsequent assignments.

111.  It is appropriate to define the relevant labor market around purchases of WGA-covered writing services for anticipated top grossing films.

112.  Beyond box office receipts, anticipated top grossing films generate revenue for a film studio through reuse of the film in secondary markets, which is traditionally done in a sequential windowing structure—home entertainment, pay-television, and streaming windows. Anticipated top grossing films that perform well at the box office generally command the highest license fees for reuse in these secondary markets. The credited screenwriter's residual compensation, in turn, is

27

generally based on a percentage of the revenue generated by the reuse in these secondary markets. The credited screenwriter of an anticipated top grossing film thus has the potential to participate in the upside of the film's success through residual compensation. Without a wide theatrical release, the home entertainment, pay-television, and streaming windows that follow either do not materialize or generate substantially diminished revenue, which in turn reduces the opportunities for residual compensation payable to the screenwriter.

113.    As a principal point of leverage in any negotiation, a screenwriter providing writing services for anticipated top grossing films relies on the credible ability to walk away and take their services to a competing film studio. Further consolidation among film studios producing anticipated top grossing films erodes that leverage, economically and creatively, by shrinking the number of destinations capable of releasing a film widely. Writers are constantly in need of employment, and with so few alternatives for their services, would likely be forced to simply take jobs at lower pay. As a result, a hypothetical monopsonist of writing services for WGA-covered anticipated top grossing films could profitably worsen terms or otherwise reduce compensation paid to screenwriters by a small but significant and non-transitory amount without losing a sufficient number of writers to other purchasers to make the decrease unprofitable.

114.    The existence of a distinct market for writing services on anticipated top grossing films is recognized throughout the industry. Trade publications including *Variety*, *The Hollywood Reporter*, and *Deadline* routinely track and report on "anticipated," "highly anticipated," and "expected blockbuster" films, treating the studio's identity, the film's projected release scale, and sometimes the purchase price of a spec script as material facts that together signal the commercial commitment behind a project. This category is thus recognized by the industry as categorically distinct from independent, limited release, or direct-to-streaming engagements in terms of compensation, creative resources, and commercial exposure.

**B.  Writing Services for Episodic Television Shows Is a Relevant Market**

115.    Another relevant market in which to analyze the proposed transaction's competitive effects is the market for writing services on episodic television shows.

28

116.    Writers of episodic television series, including 30-minute and 60-minute television series, constitute a distinct creative labor pool whose writing skills and experience differ meaningfully from those of writers who work primarily in film. Whereas screenwriting builds every element toward a single, self-contained experience with no narrative obligations beyond its own ending, episodic television writing requires developing characters and stories across episodes and seasons of the series. Episodic series writing typically involves working in a writers' room with other writers, while screenwriting is typically done by an individual writer or two-writer team.

117.    It is appropriate to define the relevant labor market around the purchase of writing services for episodic television series, where the only meaningful buyers capable of producing, distributing, and exhibiting such programming at scale are Major Television Studios.

118.    Because an episodic television writer's principal point of leverage in any negotiation is the credible ability to walk away and take their project elsewhere, further consolidation among Major Television Studios erodes that leverage, economically and creatively, by shrinking the number of destinations to which a writer can credibly offer their services. This decreased leverage for writers enables the Major Television Studios to put downward pressure on writer compensation and employment terms.

119.    Writers are constantly in need of employment, and with so few alternatives for their services, would likely be forced to simply take jobs at lower pay. A hypothetical monopsonist controlling all purchases of services from writers of episodic television series at Major Television Studios in the United States could profitably implement a small but significant and non-transitory decrease in compensation or worsening in terms without losing a sufficient number of writers to other purchasers to make the decrease unprofitable.

120.    The existence of distinct markets for writing on episodic television shows is recognized throughout the industry. Trade publications including *Variety*, *The Hollywood Reporter*, and *Deadline* routinely track and report staffing assignments in episodic television as a discrete category of transaction, distinguish writers by their experience in the format, and treat the identity of the Major Television Studio as a material fact about the assignment's value and prestige.

29

121.   Talent agencies also acknowledge the distinction between episodic television writers and screenwriters by maintaining dedicated television departments and structuring their representation practices around placing writers on episodic television series at Major Television Studios.

122.   This structure reflects the industry's recognition of episodic television writing as a specialized craft, with its own traditions of staffing, writers' room culture, and career development. Writers, agents, and studios alike negotiate, value, and report episodic television engagements differently from film engagements because the industry itself has long treated episodic television series writing as categorically distinct.

123.   In a market comprising Major Television Studios, the proposed Paramount-Warner Bros. Merger will presumptively substantially lessen competition for writing services in episodic television series across several metrics.

### C.  Writing Services of Writers Under Overall Deals Is a Relevant Market

124.   Another relevant market in which to analyze the proposed transaction's competitive effects is the market for overall deals in television at the Major Television Studios. An overall deal is an agreement under which the writer's services are exclusive to the studio for a defined term, typically ranging between two to four years, in exchange for a yearly salary or guarantee, which is commonly several million dollars per year. Under an overall deal, the writer is generally expected to create or develop television series for the hiring studio, as well as provide services on existing series produced by the employing studio. An overall deal is therefore a distinct category of work in the television industry, and much different than the typical freelance employment where a writer is employed on a particular television series on a per season basis.

125.   It is appropriate to define a relevant market around writers commanding overall deals, where the only meaningful buyers are Major Television Studios capable of offering production, distribution, and exhibition at scale, as well as having the financial resources to compensate a writer under an overall deal and pay for the writer's exclusivity to the studio.

126.   Writers who command overall deals are the most highly sought after and compensated

writers in television. They are experienced writers with proven track records of creating, developing, writing, and producing television series; industry relationships; and the capacity to function as de facto creative executives. From a writer's perspective, overall deals allow them to negotiate a premium for their exclusivity that exceeds what they could earn on a show-by-show basis. Overall deals also provide guaranteed income, institutional stability and support from the studio, and development infrastructure to move projects toward production.

127.   An overall deal writer's principal point of leverage in any negotiation is the credible ability to walk away. Further consolidation among the Major Television Studios erodes that leverage, economically and creatively, by shrinking the number of destinations to which an overall deal writer can convincingly threaten to take their services.

128.   Small and independent production companies are not reasonable alternatives for writers seeking the full benefits of an overall deal with a Major Television Studio. An independent producer may offer a development relationship but cannot consistently offer compensation commensurate with that offered by a Major Television Studio, and projects from independent producers may be harder to get made as they must compete with projects from any distributor's own affiliated studio.

129.   Writers are constantly in need of employment, and with so few alternatives for their services, would likely be forced to simply take jobs at lower pay. Not enough writers who command overall deals would switch to arrangements with smaller, independent studios to deter a hypothetical monopsonist from imposing a small but significant and non-transitory decrease in compensation or worsening of terms in overall deals.

130.   The existence of this distinct market is recognized throughout the industry. Trade publications including *Variety*, *The Hollywood Reporter*, and *Deadline* routinely track and report overall deals as a discrete category of transaction, distinguish them by studio affiliation and compensation level, and treat the identity of the Major Studio as a material fact about the deal's value.

131.   Talent agencies structure their representation practices around securing overall deals

31

at Major Television Studios, and recognize them as a career milestone, distinct from engagements on a specific season of a television series. Writers, agents, and studios alike negotiate, value, and report overall deals at Major Television Studios differently than other development arrangements with independent producers because the market itself has long treated it as categorically distinct.

132.   In a market comprising Major Television Studios, the proposed Paramount-Warner Bros. Merger will presumptively substantially lessen competition in the market for overall deal writers across several metrics.

**D.  The Relevant Geographic Market Is the United States**

133.   Defendants compete to acquire the services of writers in the United States and WGA writers are predominantly located in the United States. The geographic boundaries of these markets are reinforced by structural, regulatory, linguistic, and cultural factors that limit the substitutability of foreign writers for domestic ones.

134.   Most MBA-signatory companies are headquartered in the United States, and most MBA-covered writing employment and purchases of literary material occur in the United States.

135.   Beyond these structural constraints, the programming produced in these markets is developed specifically for American audiences, reflecting American vernacular, cultural references, and narrative sensibility in ways that are not readily replicated at scale by writers who are primarily outside of the United States.

136.   A hypothetical monopsonist controlling all sellers in the United States in the relevant labor markets listed above could profitably implement a small but significant and non-transitory decrease in compensation or worsening of terms without losing a sufficient amount of writers to other geographic markets. Accordingly, the relevant geographic market in which to assess the competitive effects of the proposed transaction is the United States.

**E.  Barriers to Entry**

137.   Entry into the markets of Major Film or Major Television Studios who purchase the relevant labor services is highly unlikely due to high barriers that no realistic entrant could overcome on a timely or sufficient basis. A new entrant cannot quickly replicate a vertically integrated

32

ecosystem, or a vast programming library; nor can it easily gain access to the top-tier talent and financing pipelines dominated by the incumbent studios. As a result, meaningful entry sufficient to replace the competition lost through consolidation is not timely, likely, or sufficient.

138. Building a fully or partially vertically integrated studio requires billions of dollars in capital investment for production, in addition to critical infrastructure like soundstages and post-production facilities. Fully vertically integrated film studios must also develop nationwide distribution networks for wide-release films, and marketing capabilities—including established relationships with exhibitors and buyers—required to launch films at scale.

139. The capital demands of tentpole filmmaking compound these barriers significantly. A tentpole project is a high-budget studio release that is expected to be a major commercial success at launch or to continue a franchise.

140. Competition at the top of the market is increasingly defined by franchise-driven tentpole releases budgeted at $100 million or more with global marketing spends frequently matching or exceeding production cost. Tentpole productions are more than expensive; they are structurally dependent on the type of national distribution infrastructure that only incumbent studios possess.

141. Tentpoles also help to generate the level of funding necessary to enter into overall deals at Major Television Studios that lock up top-tier writers. This financing architecture cannot be replicated by a new entrant studio, keeping them confined to the margins of the market where they can only afford to finance individual projects at higher risk and cost.

142. Beyond physical assets, successful entry also depends on assembling long-term relationships with top-tier talent, relationships that incumbent studios have typically foreclosed through widespread use of lucrative overall deals that a new entrant could not afford. The reality is that most commercially proven and critically credible talent is not available to a new entrant, creating a circular foreclosure: a new studio cannot sign talent without a track record and cannot create their own track record without signing talent.

143. These barriers are compounded by the entrenched position of the existing leading

33

studios. A vertically integrated studio produces programming and facilitates its own distribution, controlling the pipeline from greenlight to release, including the coordination of release timing, allocating marketing resources, and managing risk across its entire film and television programming slate in ways that an unintegrated entrant cannot replicate. Vertical integration creates a self-reinforcing financing advantage: because integrated studios can credibly commit to distributing what they produce, they attract better financing terms and more willing talent. A new entrant who lacks that integrated guarantee faces higher capital costs and less favorable financing terms at each stage of the production and distribution chain.

144. Owning a distribution channel, particularly a major streaming platform, represents a particularly formidable barrier to entry, especially in television. Developing a streaming service requires capital to develop and maintain the technology infrastructure, in addition to a robust film and series library needed to attract and retain platform subscribers. It takes many years and billions of dollars to accumulate a programming library, and without it, a new streaming entrant cannot generate the subscriber base necessary to justify the investment.

145. Given these barriers to entry, no new major studio has entered film or television in roughly a decade, and instead there has been a trend toward vertical integration and higher barriers to entry.

## ANTICOMPETITIVE EFFECTS

146. Consolidation of this magnitude will substantially lessen competition by reducing output and suppressing compensation across the film and television industry to devastating degrees. Eliminating a major buyer of writing services will have a dramatic impact on writers across each of the relevant markets, reducing their opportunities to ply their craft along with the compensation they will receive for their work.

147. Confronted with this stark reality, Paramount and Warner Bros. have offered only hollow assurances. In their official Form 8-K announcement, they claim that the merged entity will produce at least 30 theatrical films annually and expand opportunities across the film and creative industries. Those promises do not alter the Merger's likely effects and ignore historical precedent

and the basic limitations of an annual release calendar.

148.    Industry precedent strongly suggests that Hollywood mergers suppress the labor market. As television writer and producer Damon Lindelof, whose credits include *Lost*, as well as *Watchmen* and *The Leftovers*, warned: "Hollywood mergers mean fewer movies and fewer TV shows and that means fewer jobs."[22]

149.    The Disney-Fox merger provides a useful illustration: before that transaction, Disney and Fox's 20th Century label released an average of 25.6 wide-release films per year. After the merger, that number fell to 12.6 wide releases per year, even excluding the pandemic years.[23]

150.    The merger's impact on releases for the 20th Century Studios label, which operated as 20th Century Fox prior to the acquisition, was profound. In the decade leading up to the acquisition, 20th Century Fox released approximately 15 movies per year, with the majority of those being original films. In the years following the acquisition, Disney has released approximately five films per year under the 20th Century Studios label, with the majority of those being franchise films or legacy 20th Century Fox titles.[24]

151.    Immediately after acquiring 21st Century Fox, Disney closed the Fox 2000 film studio, which produced mid-budget original adult drama films with a special strength for literary adaptations. The result was further consolidation in the industry towards franchise filmmaking. Disney also removed popular Fox library titles from circulation, depriving many independent exhibitors of key film programming.

152.    Fox's multi-billion-dollar animation division, Blue Sky Studios, was entirely shuttered by Disney, which already had its own affiliated animation studio. Disney laid off hundreds of employees and simply absorbed the intellectual property into its own ecosystem.

---

[22]    Jennifer Maas, *Joaquin Phoenix, Ben Stiller, Kristen Stewart and 1,000-Plus Hollywood Names Oppose Paramount-Warner Deal in open Letter: 'Block the Merger,'* Variety (Apr. 13, 2026), https://variety.com/2026/film/news/hollywood-open-letter-paramount-warner-bros-deal-1236720249/.

[23]    *Examining the Competitive Impact of the Proposed Netflix-Warner Bros. Transaction: Hearing Before the Subcomm. on Antitrust, Competition Policy & Consumer Rights of the S. Comm. on the Judiciary*, 119th Cong. (Feb. 3, 2026) (statement of Cinema United), https://cinemaunited.org/wp-content/uploads/2026/02/Senate-SFR-Cinema-United-Final.pdf.

[24]    *Id.*

35

153.    The closures extended heavily into television. Rather than keeping Fox 21 Television (later renamed Touchstone Television) as a distinct creative competitor, the brand was converted from an entity with a particular taste profile into one aligned with Disney's creative sensibility to supply its own streaming platforms.

154.    While the deal promised an increase in creative offerings, the end result was mass layoffs, reduced output, and a near total dismantling of the Fox brand identity as a risk-taking studio culture with edgy, irreverent, and youth-focused programming.

155.    Paramount and Warner Bros.' promise of 30 theatrical releases per year also ignores practical and commercial realities. Film distributors compete for placement on a fixed 52-week calendar, with films predominantly opening on weekends. Today, Paramount and Warner Bros. independently populate that release calendar and compete against one another for premium dates. In 2025, Warner Bros. released 11 films and Paramount released 9 films; no single studio has produced and distributed more than 20 films theatrically in a single calendar year in recent history. It therefore defies reason to expect the merged entity to release *more* movies than the studios did individually, including releasing multiple, competing films on the same weekend that would cannibalize the merged entity's box office revenues. The likely result is fewer films in theaters, fewer weekends contested by competing studios, and a release calendar shaped by the scheduling preferences of a single merged entity rather than by competitive pressures in a vibrant market.

156.    Roth Capital's Eric Handler tied this to integration risk generally: "I don't remember any instance with consolidation where one plus one equals two."[25]

157.    The proposed Merger would also eliminate genre-based competition between Paramount and Warner Bros. In a competitive market, studios often release films targeting the same audience during peak periods, forcing each studio to compete on quality, marketing, and audience appeal. Paramount is scheduled to release *Sonic the Hedgehog 4* just one week before Warner Bros.' *Godzilla x Kong: Supernova*, two big-budget franchise releases competing for the same family and

---

[25]    Sarah Whitten, *Paramount CEO David Ellison wants to release 30 films annually. History and Hollywood say it's unrealistic*, CNBC (Apr. 29, 2026), https://www.cnbc.com/2026/04/29/david-ellison-paramount-warner-bros-30-film-releases.html.

36

action-tentpole audience window. After the Merger, that competition would likely disappear because a single studio would have little incentive to release competing genre films targeting the same audience at the same time.

158. The proposed consolidation will also likely reduce the number of television series produced. Paramount+ and HBO Max currently compete as independent platforms, and each maintains a slate large enough to justify its subscription price. A merged service will require less programming to serve the same subscriber base, eliminating the competitive pressure that currently drives volume. Series that currently fill distinct competitive roles on each service, such as dramas, limited series, and genre programming, will be combined into a single library where some programs would be considered duplicative, giving the merged entity both the justification and the opportunity to cut new series significantly.

159. The promise of vigorous intra-studio competition is further undermined by the $79 billion in debt that the merged entity would carry, which makes increased output that would only cannibalize overall profits even more dubious.

160. Wall Street Firm MoffettNathanson noted, when both Paramount and Netflix were potential buyers of Warner Bros., "Beyond operational synergies, content spend remains an area where cost savings are likely. . . . Despite public posturing that most or all production would be preserved, we believe it is unlikely over time that either combination would continue producing as much content as the two companies would on a standalone basis."[26]

161. Actor and producer Mark Ruffalo, testifying before the United States Senate, cut through the merging parties' promises and squarely identified the Merger's likely real-world consequences: "Tens of thousands of workers will be left poorer, along with the audiences we serve, the communities that depend on this industry, and the broader marketplace of ideas and artistic freedom. Don't be misled by empty promises from billionaires—trust competition."[27]

[26] MoffettNathanson Research, *Netflix vs. PSKY: The Art of Warners*, 8 (Dec. 15, 2025).
[27] Press Release, *Booker Holds Forum on Risks of Paramount–Skydance / Warner Bros. Discovery Merger Ahead of Shareholder Vote* (April 15, 2026), https://www.booker.senate.gov/news/press/booker-holds-forum-on-risks-of-paramountskydance-/-warner-bros-discovery-merger-ahead-of-shareholder-vote.

37

162.   Mr. Lindelof and Mr. Ruffalo are among over 5,600 film and television professionals who signed an open letter urging regulators to block the proposed Merger between Paramount and Warner Bros., warning that the Merger threatens "the sustainability of the entire creative community" and "the professional lives of the tens of thousands of workers" who comprise it.[28]

163.   For WGA members, these are not abstract concerns. Reduced output by the merged entity translates directly into fewer greenlit productions, WGA-covered projects, and diminished compensation.

**A.   The Transaction Will Substantially Lessen Competition in Each Relevant Market**

164.   To assess concentration levels, a typical starting point for merger analysis is defining a relevant market, which has both a product and a geographic dimension. Courts define relevant markets to help determine the areas of competition most likely to be affected by the merger.

165.   For decades, agencies and courts have relied on HHI figures to assess the degree to which a merger increases market concentration within a given relevant market.

166.   The HHI of a particular relevant market is calculated by summing the squares of each individual firm's market share.[29] So, for example, a market consisting of four firms with market shares of 30%, 30%, 20%, and 20%, would have an HHI of 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$).

167.   Courts and antitrust enforcers rely on the market's pre-merger HHI and the increase in concentration, or "delta HHI," resulting from the proposed transaction to determine whether a transaction is presumed likely to violate the antitrust laws.

168.   Under the Merger Guidelines and case law, a "merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly."[30] The Merger Guidelines currently set the threshold for highly concentrated markets at an HHI of 1,800.[31]

169.   The Merger Guidelines also explain, consistent with longstanding precedent, that "a

---

[28]     *Open Letter Opposing the Paramount-Warner Bros. Discovery Merger* (Apr. 2026), https://blockthemerger.com/openletter.

[29]     2023 Merger Guidelines § 2.1.

[30]     *Id.*

[31]     *Id.*

merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points."[32]

170.   The proposed acquisition would result in the substantial lessening of competition in each of the labor markets described below. Each of these products constitutes a line of commerce as that term is used in Section 7 of the Clayton Act, 15 U.S.C. § 18, and each is a relevant labor market in which competitive effects can be assessed.

171.   In each of the relevant labor markets, (1) the pre-merger HHIs reflect an already concentrated market; (2) the proposed transaction would give the merged firm a 35% to 38% market share; and (3) the proposed transaction would increase concentration by anywhere from 4 to 7x of the 100-point threshold. Thus, the proposed transaction is presumed to substantially lessen competition or tend to create a monopoly in each of these relevant markets.

### 1.   All Screenwriters of WGA-Covered Anticipated Top Grossing Films

172.   In a post-merger market, the proposed Paramount-Warner Bros. Merger would be presumptively anticompetitive across several metrics. The merged entity would capture 35% of the writing jobs for writers who work on WGA-covered anticipated top grossing films—an HHI of 2,172 and a delta HHI of 408. When accounting for an expansive market of all film studios, the proposed merger clears the presumptive threshold for anticompetitive concentration for writing services on anticipated top grossing films.

| Writing Services for WGA-Covered Anticipated Top Grossing Films at All Studios (2021-2024) | |
| --- | --- |
| Studio | Writing Jobs |
| Warner Bros. | 27% |
| Paramount | 7% |
| **Warner Bros.-Paramount (Merged)** | **35%** |
| Pre-merger HHI | 1,765 |
| **Post-merger HHI** | **2,172** |
| **Delta HHI** | **408** |

---

[32]     *Id.*

### 2. *All Episodic Television Writers on WGA-Covered Projects*

173.   In a market comprising Major Television Studios, the proposed Paramount-Warner Bros. Merger will presumptively substantially lessen competition for writing services across episodic television on WGA-covered series across several metrics. The merged entity would capture 36% of television projects in the market—yielding an HHI of 2,408 and a delta HHI of 639—and 36% of writers—an HHI of 2,596 and a delta HHI of 644. By either metric, the proposed Merger clears the presumption of anticompetitive harm in the market for writing services on episodic television series.

| Writing Services for All Episodic Television WGA-Covered Series at the Major Television Studios (2022-2025) | | |
|---|---|---|
| Studio | Projects | Writers |
| Warner Bros. | 16% | 16% |
| Paramount | 20% | 20% |
| **Warner Bros.-Paramount (Merged)** | **36%** | **36%** |
| Pre-merger HHI | 1,769 | 1,951 |
| **Post-merger HHI** | **2,408** | **2,596** |
| **Delta HHI** | **639** | **644** |

### 3. *Overall Deal Writers*

183.   A Paramount-Warner Bros. Merger would presumptively threaten to substantially lessen competition in the market for overall deals. Thirty-eight percent (38%) of television writers under overall deals at Major Television Studios would be consolidated under the merged entity, with an HHI of 2,496, and a delta HHI of 727, satisfying the threshold for a merger that presumptively threatens to substantially lessen competition.

| Overall Deals at the Major Television Studios (2021-2024) | |
|---|---|
| Studio | Writers |
| Warner Bros. | 21% |
| Paramount | 17% |
| **Warner Bros.-Paramount (Merged)** | **38%** |
| Pre-merger HHI | 1,769 |
| **Post-merger HHI** | **2,496** |
| **Delta HHI** | **727** |

40

**B.  The Transaction Will Lead to Lower Wages for Writers**

184.   The proposed Merger threatens to reduce meaningful competition across multiple layers of the entertainment market.

185.   By combining two of the remaining major studios, the deal would reduce the number of buyers of film and television writing services and consolidate control over key production infrastructure and distribution channels, including wide theatrical releases, broadcast networks, cable channels, and streaming platforms.

186.   Foreclosure from the walled garden of a merged studio is of particular concern because employment in film and television is significantly shaped by the subjective preferences and worldviews of executives. Accordingly, with fewer stakeholders, the merged entity threatens viewpoint diversity and freedom of expression.

187.   No independent studio or third-party distributor can offer an equivalent substitute to a merged Major Film or Major Television Studio, because none will command the same integration of production capability and owned-and-operated distribution at scale.

188.   With fewer independent competitors, the merged entity would have greater ability to extract rents from unaffiliated downstream distributors and restrict output without losing customers. These are classic anticompetitive effects of market concentration, long recognized in antitrust economics.

189.   These anticompetitive effects in downstream consumer-facing markets will have immediate effects in the relevant labor markets for creative professionals.

190.   Paramount and Warner Bros. actively compete against each other, head-to-head, for creative workers, including writers. Major Film and Major Television Studios function as primary buyers of scripts, writing services, and other creative work; when their number shrinks, so too does the number of meaningful opportunities for writers to sell their projects and the risk of tacit collusion, already a feature in this market, increases significantly. This creates a monopsony effect, where a smaller pool of buyers exerts downward pressure on wages, compensation structures, overall deal terms, and other transaction terms. Writers will face fewer bids, reduced leverage in

41

negotiations, and diminished ability to secure favorable creative and working conditions.

191. The market for overall deals for top television writers has already begun to shrink as a result of industry changes. As the number of buyers diminishes, writers have fewer alternative buyers to turn to, and studios are disincentivized to put writers under exclusive overall deals at all.

192. Michael Schur pinpoints 2017 as the year he realized that increased concentration and vertical integration had fundamentally changed the market while pitching a new show to the industry. Despite his successful track record, big-name talent associated with the project, and interest from multiple buyers, the show could not be sold due to limited demand for unaffiliated programming from other outlets. He explains: "What I came to understand is that the studios had become so horizontally consolidated (through corporate mergers) and vertically siloed (the buyers incentivized to purchase shows only from their 'hometown' studios) that the deal terms at which a seller was willing to sell, and at which an outside buyer was willing to buy, no longer overlapped. Even when both sides had an interest in making a show together and wanted to close the deal based on the creative package, no deal could be reached. I had never experienced this before, and it signaled to me that something fundamental had broken in the market." This was not a one-off experience. Mr. Schur describes how he began to be "routinely told by studio executives that there was no point in pitching to certain networks or platforms . . . because it was widely understood throughout the industry that the deal economics no longer worked." In other words, because of increased concentration and vertical integration, buyers no longer had a strong economic incentive to buy programming from outside of their affiliated studios.

193. Television showrunner, writer, and producer Shawn Ryan—whose credits include *The Night Agent*, *The Shield*, *The Unit*, and *S.W.A.T.*—explains how vertical integration has made it increasingly difficult to get shows made, particularly for non-vertically integrated studios: "My experience at Sony Pictures Television shows the effects of this harmful trend toward vertical integration. Toward the end of my time at Sony, it was increasingly difficult to get the shows I was pitching sold and produced, especially at the main four broadcast networks. This is because Sony does not have vertically integrated television or major streaming distribution channels that it can use to deliver its series to audiences. Instead, Sony licenses its projects to third-party

42

platforms and networks that distribute its programs in exchange for a fee. Other distributors would previously purchase programs from Sony, such as *S.W.A.T.*, by paying a licensing fee to defray the costs of producing the show. But because the remaining major studios had vertically integrated, combining production with distribution, it became comparatively much more expensive to license a show from Sony than for the studio-distributor to produce it in-house. This had the effect of disadvantaging Sony's writers by making their shows harder to sell, causing fewer to be produced and leading to earlier cancellations of their shows on the air. By the end of my overall deal at Sony Pictures Television we had been instructed that Sony wouldn't even try to sell dramas to the four broadcast networks, except under very special low-cost circumstances."

194.   The market for screenwriters' services on anticipated highly grossing films has been similarly diminished. As David Koepp explains: "The universe of studios capable of making a glossy, star-driven film at a healthy budget has contracted to only a handful of companies." When the industry had more studios, writers could force the studios to enter serious competition for a script and use this competition to secure more favorable terms. In 2001, Koepp brought his *Panic* Room spec script to 19 viable buyers. Since then, consolidation has reduced the number of viable buyers to a handful, and writers are no longer able to leverage interest from multiple buyers to negotiate better deals for themselves.

195.   If deal terms and compensation for writers are suppressed, fewer writers will be able to sustain careers. And because writer compensation is based on industry experience, writers' career progression and opportunities will be diminished.

196.   These two dynamics are mutually reinforcing. As the merged company seeks to maximize returns on its expanded scale and service deal-related debt, it will have incentives and the increased ability due to diminished competition both to increase monetization (through pricing and licensing strategies) and reduce costs (through lower labor and production spending).

197.   The result is a transfer of value away from consumers and creators and towards the merged firm.

**C. The Merger Will Reduce the Quantity, Variety, and Quality of Creative Works**

198.   The proposed combination of Paramount and Warner Bros. would substantially lessen

43

competition by reducing the quantity of films and television projects produced. As the recent Disney-Fox merger shows, the concentration of decision-making power into a single, larger studio has stronger incentives to reduce competing projects and to streamline overall production to avoid internal competition. What remains is a more homogenized film and television slate, shaped by centralized priorities rather than a competitive marketplace of ideas. In the words of screenwriter, producer, and director Adam McKay—whose credits include *Anchorman: The Legend of Ron Burgundy*, *Talladega Nights: The Ballad of Ricky Bobby*, *Step Brothers*, and *The Big Short*: "The remaining studios today are no longer independent creative entities. They are divisions of massive conglomerates with political exposure and financial relationships extending far beyond the entertainment industry. Those pressures shape what gets made. In my more than thirty years in this industry, the creative mandate has never been as subordinate to the corporate mandate as it is today."

199. According to a major shareholder and former director of Warner Bros., the Paramount-Warner Bros. Merger will reduce output: "If you put it together with another studio. You're going to try and find synergies. You're going to have perhaps compression of activity."[33]

200. Because the Paramount-Warner Bros. merged entity will carry significant debts, the merged firm would also likely focus on a smaller number of lower-risk, higher-return projects, resulting in a significant reduction in output through fewer films and television projects.

201. As consolidation increases, studios increasingly will prioritize the lowest-risk projects, i.e., large-scale, franchise-driven tentpole programs over riskier, original, or mid-budget films. In addition, decision-making power about which stories get told will be consolidated into fewer hands.

202. With fewer studios competing to back creatively diverse stories, the range of genres, voices, and creative perspectives narrows. Smaller and independent projects outside tentpole franchises will increasingly struggle to find funding and distribution.

---

[33] Jill Goldsmith, *John Malone Sizes Up Warner Bros. Discovery Suitors*, Deadline (Nov. 13, 2025), https://deadline.com/2025/11/warner-bros-discovery-john-malone-larry-ellison-netflix-1236616659/?utm_source=substack&utm_medium=email.

44

**D. The Merger Will Increase the Likelihood of Coordination**

203. Reducing the number of Major Film Studios and eliminating a competitive Major Television Studio would significantly tighten the interdependence of the remaining firms. The Major Film and Major Television Studios are the primary buyers of creative work, and they interact with the same pool of writers and agents on a continuous, repeat basis across every segment of the market. With fewer major studios competing for those writers, especially ones known to produce popular work or who have cultivated a reputation and skillset in a particular genre, the implicit understanding is that aggressive bidding harms all buyers. Consequently, the remaining Major Film and Major Television Studios would be motivated to underbid on writers' work, an anticompetitive practice that becomes easier to sustain and harder to detect in a further consolidated market.

204. The increased concentration from the proposed Merger would substantially increase the risk of coordination among the remaining Major Film and Major Television Studios.

205. Tacit coordination occurs when competitors, even in the absence of explicit agreement, independently adopt similar pricing or output strategies because each recognizes that doing so is in its individual interest, given the anticipated reactions of its rivals.

206. Courts and antitrust economists have long recognized that tacit coordination is most likely to emerge, and most difficult to detect or remedy, in highly concentrated markets with a small number of sophisticated, repeat-playing competitors who interact across multiple dimensions simultaneously.

207. Even prior to the Merger, the Major Film and Major Television Studios already constitute a concentrated oligopsony in which each firm is already a significant and identifiable presence in every major segment of the market. Each studio tracks the others' output decisions, release schedules, and talent acquisitions closely and continuously. Each understands that the market is small enough that its own decisions will affect its rivals, and that its rivals' responses will in turn affect it.

208. This mutual interdependence is among the structural preconditions for tacit

45

coordination, and already exists to a meaningful degree. The Major Film and Major Television Studios have collectively suppressed writers' compensation and degraded their working conditions through parallel practices that required no explicit agreement to sustain. At least one studio has also engaged in informal compensation benchmarking in which studio employees routinely contact a writer's former employers to ascertain what the writer had previously been paid to anchor future offers below competitive rates.

209. Netflix, for instance, has invented multiple compensation practices that put pressure on writers' compensation that have spread industry-wide—easily accomplished in a highly concentrated market rife with conditions that facilitate tacit coordination. Before the 2023 WGA strike, Netflix had capped weekly compensation for the highest level of television writers at $12,500, paid showrunners below MBA weekly minimums during post-production, and popularized the practice of the "mini-room" in which writers convene briefly to develop unordered series, extracting creative labor for reduced cost. And although the 2023 WGA strike secured some protections against these practices, employer pressure on writers to produce more in shorter timeframes persists.

210. These practices are not isolated. In 2024, Paramount entered a more than $3 million settlement with the WGA after prematurely closing the writers' room in three streaming series— *MacGyver*, *Seal Team*, and *Hawaii 5-0*—to avoid paying weekly writers' fees.[34]

211. These practices share a common feature that distinguishes them from ordinary competitive behavior: they are most profitable when adopted industry-wide, and least profitable when unilaterally adopted in isolation. If, for example, a single studio imposed shorter and smaller "mini rooms" while rival studios offered more fully staffed writers' rooms, the studio imposing "mini rooms" could lose top talent to its competitors. That "mini rooms" became an industry-wide practice is structural evidence that major studios were coordinating, at least tacitly, on a strategy that ultimately harmed writers and required collective adoption to push back against. The proposed

---

[34] Erik Pedersen, *CBS & WGA West Settle Arbitration Claim Over Work Done After Writers Room Shut-Downs*, Deadline (Jul. 10, 2024), https://deadline.com/2024/07/cbs-wga-settlement-writers-rooms-1236006230/.

46

Merger will intensify this trend to the detriment of competition in the labor markets for writers.

212. Concentration weakens overall deals in two related ways: with fewer competing studios, studios have less incentive to bid against one another, and fewer buyers make it easier to coordinate on compensation. At their core, overall deals can be a defensive mechanism—studios sign writers to exclusive arrangements. That competitive pressure is what generates overall deals in the first instance, and as the number of major buyers decreases, so does the incentive to offer these deals. In a consolidated market, fewer studios competing for the same talent means fewer overall deals, and fewer overall deals means fewer television writers with guaranteed, stable income commensurate with their value. And, as in any concentrated market with fewer players, the remaining buyers face less friction in coordinating on the compensation terms of the overall deals they offer.

**NO PROCOMPETITIVE EFFECTS OR MERGER-SPECIFIC EFFICIENCIES JUSTIFY THE PROPOSED TRANSACTION**

213. The proposed Merger will not generate any meaningful efficiencies or benefits for competition in the relevant markets. The proposed transaction also will not reduce prices, increase wages, increase output, or enhance the creative diversity of films and series.

214. To the contrary, Paramount has predicted over $6 billion in synergies from the Merger, with mass job losses inevitable.[35] The merging parties have identified no efficiencies that might purportedly benefit consumers or workers. All the "synergies" the parties describe simply mean paying fewer workers less.

215. The claimed benefits, such as cost savings, improved distribution, and enhanced programming production, are not unique to the Merger itself. Firms can and routinely do achieve similar outcomes through less anticompetitive means without eliminating a major competitor from the market.

216. Moreover, the efficiencies cited by the parties largely take the form of cost-cutting,

---

[35] David Dayen, *Paramount-Warner Would Create a Hollywood Jobs Apocalypse*, The American Prospect (Mar. 2, 2026), https://prospect.org/2026/03/02/paramount-warner-merger-netflix-hollywood-jobs-layoffs-antitrust/.

47

including reductions in overlapping operations, consolidation of platforms, and workforce reductions. While such measures may improve the merged firm's balance sheet, they do not constitute procompetitive benefits under antitrust law. Efficiencies that arise from layoffs, reduced output, or diminished competition for creative labor are non-cognizable, direct evidence of the very harms antitrust law is designed to prevent.

217.   Nor is there any persuasive argument that the Merger would lead to greater innovation or improved quality. To the contrary, by reducing the number of vertically integrated studios capable of financing and distributing programming at scale, the transaction would lessen competitive pressure to invest in diverse, high-quality programming. Any purported gains in scale or efficiencies are outweighed by the loss of rivalry between two vertically integrated studios, which drives investment, experimentation, and responsiveness to audience demand.

## ANTITRUST INJURY AND HARM TO PLAINTIFFS

218.   The likely substantial lessening of competition in the relevant markets will cause direct, substantial, and irreparable harm to writers and the WGA alike.

219.   The WGA's mission is to represent and advocate for writers in the film and television entertainment industry. The WGA primarily does this through negotiating and administering contracts that protect the creative and economic rights of its members. The WGA furthers the interests of writers in other ways, including through legislative advocacy, public relations efforts, and by sponsoring seminars, panel discussions, and special events for its members and the public.

220.   The proposed Merger directly and irreparably interferes with the WGA's mission, including by reducing the negotiating leverage its members have when selling their writing services.

221.   The proposed transaction will also directly injure the WGA financially by reducing Guild dues revenue (as a result of reduced writer compensation, both as the effect of the combined entity's downward pressure on writer compensation and reduction in the number of writer jobs), and by requiring the WGA to expend significant resources to combat the harms caused by the increased concentration.

## CLAIM FOR RELIEF

222. Were it to be consummated, Paramount's Merger with Warner Bros. would substantially and irreversibly lessen competition in interstate trade and commerce in the relevant, defined labor markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

223. The WGA is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, to protect against the injuries threatened by this violation of the antitrust laws.

224. Unless enjoined, the Merger will substantially lessen competition by inflicting the following effects on the relevant markets:

 a. Actual and potential competition between Paramount and Warner Bros. will be eliminated.

 b. Competition for writing services for WGA-covered anticipated top grossing films will be substantially lessened.

 c. Competition for writing services for WGA-covered episodic television shows, including at Major Television Studios, will be substantially lessened.

 d. Competition for overall deals, including at Major Television Studios, will be substantially lessened in each of the defined relevant markets.

 e. Compensation for writers will be substantially lessened compared to those that would prevail absent the Merger.

 f. Tacit coordination in a further consolidated market of studios exploiting their monopsony power will be enabled.

 g. The quantity, variety, and quality of creative projects writers can be employed to write or furnish scripts for will be substantially reduced and impaired.

225. Unless enjoined, the proposed Merger will substantially lessen competition, by reducing output, lowering quality and variety, and decreasing employment options available to writers, all of which will result in reduced compensation to writers, and increased monopsony rents to the merged entity from higher prices to consumers.

49

## **PRAYER FOR RELIEF**

226. The WGA respectfully requests that this Court:

a. Adjudge and decree that the proposed Merger is unlawful because it violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

b. Enter judgment in favor of the WGA against Defendants;

c. Enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from consummating the proposed transaction;

d. Award the WGA its reasonable costs and attorneys' fees, as provided by law, including 15 U.S.C. § 26; and

e. Award any such other relief as it may deem just and proper.

Date: July 14, 2026

By: */s/ David C. Brownstein*

DAVID C. BROWNSTEIN (SBN: 141929)
DAVID M. GOLDSTEIN (SBN: 142334)
**FARMER BROWNSTEIN JAEGER
GOLDSTEIN SIEGEL & SHEPARD LLP**
155 Montgomery Street, Suite 301
San Francisco, CA 94104
Telephone: (415) 962-2873
dbrownstein@fbjgss.com
dgoldstein@fbjgss.com

KELLIE LERNER (*pro hac vice* to be filed)
ELLISON A. SNIDER (*pro hac vice* to be filed)
BENJAMIN B. ALLEN (*pro hac vice* to be filed)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
Telephone: (646) 960-8601
Facsimile: (646) 960-8625
kellie@scl-llp.com
esnider@scl-llp.com
ballen@scl-llp.com

COMPLAINT
Case No.

J. WYATT FORE (*pro hac vice* to be filed)
**SHINDER CANTOR LERNER LLP**
600 14th Street, NW
Washington, D.C. 20005
Telephone: (646) 960-8632
wyatt@scl-llp.com

N. SLADE BOND II (*pro hac vice* to be filed)
CHARLES J. LADUCA (*pro hac vice* to be filed)
**CUNEO GILBERT
FLANNERY & LADUCA, LLP**
2445 M Street, NW Suite 740
Washington, D.C. 20037
Telephone: (202) 789-3960
sbond@cuneolaw.com

SARAH ROONEY (*pro hac vice* to be filed)
**CUNEO GILBERT
FLANNERY & LADUCA, LLP**
8705 Colesville Road
B. 133
Silver Spring, MD 20910
Telephone: (301) 518-7428
srooney@cuneolaw.com

MICHAEL J. FLANNERY (SBN: 196266)
**CUNEO GILBERT
FLANNERY & LADUCA, LLP**
Two CityPlace Drive
St. Louis, MO  63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

MATTHEW J. PLATKIN (*pro hac vice* to be filed)
AARON HAIER (*pro hac vice* to be filed)
**PLATKIN LLP**
413 Washington Avenue, Unit 174
Belleville, NJ 07109
Telephone: (973) 561-1951
mplatkin@platkinllp.com

*Attorneys for Plaintiffs the Writers Guild of America,
West, Inc., and the Writers Guild of America East, Inc.*

51

**FILER'S ATTESTATION**

I, David C. Brownstein, am the ECF User whose ID and password are being used to file this Complaint. In compliance with Civil Local Rule 5-1(i), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

By: /s/ *David C. Brownstein*
David C. Brownstein

52

COMPLAINT
Case No.