KELLIE LERNER (*pro hac vice*)
ELLISON A. SNIDER (*pro hac vice*)
BENJAMIN B. ALLEN (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
Telephone: (646) 960-8601
kellie@scl-llp.com
esnider@scl-llp.com
ballen@scl-llp.com

J. WYATT FORE (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
600 14th Street, NW
Washington, D.C. 20005
Telephone: (646) 960-8632
wyatt@scl-llp.com

DAVID C. BROWNSTEIN (SBN: 141929)
DAVID GOLDSTEIN (SBN: 142334)
**FARMER BROWNSTEIN JAEGER
GOLDSTEIN SIEGEL & SHEPARD LLP**
155 Montgomery Street, Suite 301
San Francisco, CA 94104-2733
Telephone: (415) 962-2873
dbrownstein@fbjgss.com
dgoldstein@fbjgss.com

CHARLES J. LADUCA (*pro hac vice*)
N. SLADE BOND II (*pro hac vice*)
**CUNEO GILBERT
FLANNERY & LADUCA, LLP**
2445 M Street, NW Suite 740
Washington, D.C. 20037
Telephone: (202) 789-3960
sbond@cuneolaw.com

SARAH ROONEY (*pro hac vice*)
**CUNEO GILBERT
FLANNERY & LADUCA, LLP**
8705 Colesville Road
B. 133
Silver Spring, MD 20910
Telephone: (301) 518-7428
srooney@cuneolaw.com

MATTHEW J. PLATKIN (*pro hac vice*)
AARON HAIER (*pro hac vice*)
**PLATKIN LLP**
413 Washington Avenue, Unit 174
Belleville, NJ 07109
Telephone: (973) 561-1951
mplatkin@platkinllp.com
ahaier@platkinllp.com

*Attorneys for Plaintiffs*
*the Writers Guild of America, West, Inc., and*
*the Writers Guild of America East, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WRITERS GUILD OF AMERICA, WEST, INC., and WRITERS GUILD OF AMERICA EAST, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> PARAMOUNT SKYDANCE CORPORATION, and WARNER BROS. DISCOVERY, INC., <br><br> Defendants. | Case No.  4:26-cv-07212 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** <br><br> **Date:   August 3, 2026** <br> **Time:   3:00 pm** <br> **Judge:  Hon. Araceli Martínez-Olguín** |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, subject to the Court's approval of Plaintiffs' scheduling motion, on Monday August 3, 2026 at 3:00 PM, or as soon thereafter as can be heard, in Courtroom 5, 2nd Floor, Ronald V. Dellums Federal Building and U.S. Courthouse, 1301 Clay Street, Oakland, California, Plaintiffs the Writers Guild of America, West, Inc. ("WGAW") and the Writers Guild of America East, Inc. ("WGAE," and together with the WGAW, the "WGA"), hereby move, under Rule 65 of the Federal Rules of Civil Procedure, Local Civil Rule 65-2, and Section 16 of the Clayton Act, 15 U.S.C. § 26, for a preliminary injunction against Defendants Paramount Skydance Corp. ("Paramount") and Warner Bros. Discovery, Inc. ("Warner Bros.") enjoining Defendants from closing or consummating Paramount's proposed acquisition of Warner Bros. (the "Merger" or "Transaction") or taking any steps to integrate or consolidate their operations. This Motion is made on the grounds that (1) the WGA is likely to succeed on the merits of its claims that the Merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18; (2) the WGA and its members are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities weighs in the WGA's favor; and (4) the public interest supports an injunction.

Plaintiffs' Motion for a Preliminary Injunction is based upon this Notice of Motion and Motion, and the following concurrently filed documents, as well as all of the papers and pleadings on file in this action, including those that are cross-referenced in these papers and pleadings, associated backup materials, all papers submitted in any related case, and upon such other and further evidence as the Court may be presented at the time of any hearing:

1. Memorandum of Points and Authorities in Support of Motion for a Preliminary Injunction;
2. Declaration of Kellie Lerner in Support of Plaintiffs' Motion for a Preliminary Injunction, including all Exhibits attached thereto ("Lerner Decl.");
3. Declaration of Dr. Eric R. Emch in Support of Plaintiffs' Motion for a Preliminary Injunction, including all Exhibits attached thereto ("Emch Decl.");

4.  Declaration of David G. Koepp in Support of Motion ("Koepp Decl.");

5.  Declaration of Adam J. McKay in Support of Motion ("McKay Decl.");

6.  Declaration of Michele Mulroney in Support of Motion ("Mulroney Decl.");

7.  Declaration of Shawn P. Ryan in Support of Motion ("Ryan Decl.");

8.  Declaration of Michael H. Schur in Support of Motion ("Schur Decl."); and

9.  [Proposed] Order Granting Plaintiffs' Motion for a Preliminary Injunction ("the "Order").

**TABLE OF CONTENTS**

I.          INTRODUCTION.................................................................................9

II.        BACKGROUND ...............................................................................12

      A.     PLAINTIFFS THE WGAW AND THE WGAE…………………..12

      B.     WGA WRITERS BENEFIT FROM COMPETITION AMONG MAJOR STUDIOS ....................................................................12

      C.     MAJOR STUDIOS DECIDE WHICH STORIES GET TOLD ..............13

      D.     RECENT ENTERTAINMENT INDUSTRY CONSOLIDATION.........13

      E.     THE PROPOSED TRANSACTION AND ITS LIKELY IMMEDIATE ANTICOMPETITIVE EFFECTS..................................................15

      F.     FEDERAL AND STATE REVIEW OF THE TRANSACTION ............17

III.      LEGAL STANDARDS .....................................................................18

IV.      ARGUMENT....................................................................................18

      A.     THE WGA IS LIKELY TO SUCCEED ON THE MERITS....................18

           i.     The Relevant Market for Writing Services on WGA-Covered Anticipated Top Grossing films........................................20

           ii.    The Transaction Is Presumptively Unlawful................................23

           iii.   The Transaction Will Eliminate Head-to-Head Competition......24

           iv.   Evidence Confirms that the Transaction Will Have Anticompetitive Effects ....................................................25

           v.    The Merging Parties Cannot Rebut the Prima Facie Case..........29

      B.     WRITERS WILL SUFFER IRREPARABLE HARM FROM THE MERGER..................................................................................31

      C.     THE PUBLIC INTEREST AND BALANCE OF EQUITIES TIP IN FAVOR OF AN INJUNCTION................................................32

V.        CONCLUSION ................................................................................33

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra,*

    901 F.3d 1166 (9th Cir. 2018) ...............................................................................18, 20

*Al Otro Lado v. Wolf,*

    952 F.3d 999 (9th Cir. 2020) ..................................................................................11, 33

*Boardman v. Pac. Seafood Grp.,*

    822 F.3d 1011 (9th Cir. 2016) ...........................................................................11, 20, 31

*Brown Shoe Co. v. United States,*

    370 U.S. 294 (1962)...........................................................................................9, 21, 22

*California v. Am. Stores Co.,*

    495 U.S. 271 (1990)......................................................................................................10

*State of California, et al. v. Paramount Skydance Corp.*

    *and Warner Bros. Discovery, Inc.,*

    No. 4:26-cv-7116 (N.D. Cal. 2026) .................................................................10, 16, 18

*Colorado v. DeJoy,*

    487 F. Supp. 3d 1061 (D. Colo. 2020)..........................................................................33

*DIRECTV, LLC v. Nexstar Media Grp., Inc.,*

    2026 U.S. Dist. LEXIS 66737 (E.D. Cal. Mar. 27, 2026) ............................................32

*E. Bay Sanctuary Covenant v. Biden,*

    993 F.3d 640 (9th Cir. 2021) .......................................................................................18

*Epic Games, Inc. v. Apple Inc.,*

    2020 U.S. Dist. LEXIS 154231 (N.D. Cal. Aug. 24, 2020)....................................11, 33

*FTC v. Weyerhaeuser Co.,*

    665 F.2d 1072 (D.C. Cir. 1981)...................................................................................31

*FTC v. H.J. Heinz Co.,*

    246 F.3d 708 (D.C. Cir. 2001) ...............................................................26, 28, 29, 31

*FTC v. IQVIA Holdings Inc.,*

    710 F. Supp. 3d 329 (S.D.N.Y. 2023)...........................................................................24

*FTC v. Kroger Co.,*

    2024 U.S. Dist. LEXIS 223077 (D. Or. Dec. 10, 2024) .................................23, 24, 33

*FTC v. Penn State Hershey Med.*

*Ctr.*, 838 F.3d 327 (3d Cir. 2016) ...............................................................................................29

*FTC v. Procter & Gamble Co.*,

    386 U.S. 568 (1967).................................................................................................................29

*FTC v. Staples, Inc.*,

    970 F. Supp. 1066 (D.D.C. 1997)............................................................................................19

*FTC v. Sysco Corp.*,

    113 F. Supp. 3d 1 (D.D.C. 2015)................................................................................10, 20, 24, 29

*FTC v. Tapestry, Inc.*,

    755 F. Supp. 3d 386 (S.D.N.Y. 2024)...............................................................................20, 24

*FTC v. Warner Commc'ns, Inc.*,

    742 F.2d 1156 (9th Cir. 1984) ........................................................................................18, 23, 25

*Hosp. Corp. of Am. v. FTC*,

    807 F.2d 1381 (7th Cir. 1986) ...............................................................................................23

*Hunt v. Wash. State Apple Advert. Comm'n*,

    432 U.S. 333 (1977)...............................................................................................................12

*In re Nexstar-TEGNA Merger Litig.*,

    2026 U.S. Dist. LEXIS 85526 (E.D. Cal. Apr. 17, 2026)...................................................... *passim*

*Knevelbaard Dairies v. Kraft Foods, Inc.*,

    232 F.3d 979 (9th Cir. 2000) .............................................................................................11, 32

*Kottaras v. Whole Foods Mkt., Inc.*,

    281 F.R.D. 16 (D.D.C. 2012).................................................................................................30

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,

    275 F.3d 762 (9th Cir. 2001) .................................................................................................20

*Ohio v. Am. Express Co.*,

    585 U.S. 529 (2018)...........................................................................................................28, 29

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,

    944 F.2d 597 (9th Cir. 1991) .................................................................................................21

*St. Alphonsus Med. Ctr.- Nampa, Inc. v. St. Luke's Health Sys.*,

    778 F.3d 775 (9th Cir. 2015) ............................................................................10, 19, 20, 26, 29

*Syufy Enters. v. Am. Multicinema, Inc.*,

    793 F.2d 990 (9th Cir. 1986) .............................................................................................21, 22

*Tasty Baking Co. v. Ralston Purina, Inc.*,

653 F. Supp. 1250 (E.D. Pa. 1987) ..............................................................11, 31, 32

*Todd v. Exxon Corp.*,

275 F.3d 191 (2d Cir. 2001)..............................................................................19, 20

*United States v. Acorn Eng'g Co.*,

1981 U.S. Dist. LEXIS 13943 (N.D. Cal. 1981) .......................................11, 31, 32, 33

*United States v. Anthem, Inc.*,

855 F.3d 345 (D.C. Cir. 2017).....................................................................28, 30

*United States v. Bertelsmann SE & Co.*,

646 F. Supp. 3d 1 (D.D.C. 2022) ................................................................ *passim*

*United States v. H&R Block, Inc.*,

833 F. Supp. 2d 36 (D.D.C. 2011)...........................................................23, 24, 25, 26

*United States v. JetBlue Airways Corp.*,

712 F. Supp. 3d 109 (D. Mass. 2024) .........................................................................24

*United States v. Phila. Nat'l Bank*,

374 U.S. 321 (1963)................................................................................... *passim*

*United States v. Syufy Enters.*,

903 F.2d 659 (9th Cir. 1990) .........................................................................18

*United States v. Tribune Publ'g Co.*,

2016 U.S. Dist. LEXIS 54494 (C.D. Cal. Mar. 18, 2016) ...........................................32

*Washington v. Franciscan Health Sys.*,

388 F. Supp. 3d 1296 (W.D. Wash. 2019)...................................................................25

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,

549 U.S. 312 (2007)...............................................................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7 (2008)...................................................................................................18

**STATUTES**

15 U.S.C. § 18 (Clayton Act § 7)..............................................................................2, 18

15 U.S.C. § 26 (Clayton Act § 16).................................................................................2

**RULES**

Fed. R. Civ. P. 65 ........................................................................................................2

N.D. Cal. Civil L.R. 65-2 ..............................................................................................2

**OTHER AUTHORITIES**

2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2014) ....................................2

U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023) ............................. *passim*

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Paramount Skydance Corporation ("Paramount") proposes to acquire Warner Bros. Discovery, Inc. ("Warner Bros.") in a $110.9 billion transaction ("the Transaction"), one of the largest in the history of the entertainment industry. If the Transaction closes, the combined company will be the largest buyer of screenwriting services on blockbuster films in the United States, eliminating head-to-head competition between two studios that have competed against each other for talent, projects, and audiences for more than a century. These competitive harms are distinct from those described by the coalition of State Attorneys General, but are no less dire or urgent. Writers, the people who transform blank pages into unforgettable stories, will be some of the first to bear the harms of that loss of competition. Plaintiffs, the Writers Guild of America, West, Inc. ("WGAW") and the Writers Guild of America East, Inc. ("WGAE," and together with the WGAW, the "WGA") are the labor unions that represent these writers. To preserve the competition essential to creative opportunity and fair compensation, the WGA respectfully moves for a preliminary injunction prohibiting Paramount and Warner Bros. from closing or otherwise consummating the Transaction before the Court determines whether it is unlawful.

The Clayton Act is designed to prevent "a rising tide of economic concentration in the American economy," *Brown Shoe Co. v. United States*, 370 U.S. 294, 315 (1962), and "to arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappear[] through merger." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 367 (1963). This incipiency standard distinguishes the Clayton Act from the antitrust laws' application in the non-merger context. It applies with equal force to labor markets, including markets for creative labor. *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 21–22 (D.D.C. 2022). When Paramount and Warner Bros. compete for the same writer's work, that competition supports the writer's ability to command fair compensation. It also allows a writer to walk away from a bad deal and sell their writing services to an employer that offers better terms. The WGA's right to bring suit, on behalf of itself and the members it represents, is clearly and firmly grounded in

Congress's express design: "Private enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990).

Plaintiffs satisfy each of the requirements for a preliminary injunction. First, the Transaction is presumptively illegal in the market for writing services for anticipated top grossing films.[1] It would give the combined entity a 35% market share, and raise the HHI[2] in that market by 408 points to 2,172. *Phila. Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); Merger Guidelines § 2.1 (transaction presumptively illegal if (1) market concentration exceeds 30% or 1,800 HHI, and (2) the transaction creates a change in HHI greater than 100).[3] The Transaction would also eliminate head-to-head competition between two close competitors, whose competition is vital for WGA writers. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015) ("[A] merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition." (collecting cases)). If consummated, the Transaction would immediately harm writers in this relevant market through

---

[1] The Transaction would substantially reduce competition in each of the complaint's three relevant markets. But granting Plaintiffs' preliminary-injunction request in any one relevant market would have the same practical effect as granting it in all three. Therefore, in the interests of judicial efficiency and given the accelerated litigation schedule, Plaintiffs move only as to this relevant market at this time, while preserving all rights to seek adjudication of the remaining markets on the merits after developing a full discovery record. *See State of California, et al. v. Paramount Skydance Corp. and Warner Bros. Discovery, Inc.*, No. 4:26-cv-7116 at 4 (N.D. Cal. July 20, 2026) ("Because the Plaintiff States are entitled to a TRO if they make a sufficient showing in only a single relevant market, the Court evaluates the factors for preliminary injunctive relief focusing on the market for distribution of wide-release theatrical films.").

[2] HHI refers to the Herfindahl-Hirschman Index, a standard economic tool used for measuring market concentration. HHI is "calculated by summing the squares of the individual firms' market shares, which gives proportionately greater weight to the larger market shares." *St. Alphonsus Med. Ctr.- Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 786 (9th Cir. 2015) (internal quotation marks omitted) (citation omitted). For example, a market consisting of four firms with shares of 30%, 30%, 20%, and 20% would have an HHI of 2,600 (900 + 900 + 400 + 400 = 2,600).

[3] U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf.

10

reduced output (in the form of fewer and worse employment opportunities), depressed compensation, limited creative choice, and more one-sided terms across the industry—the very harms Congress enacted the Clayton Act to prevent.

Second, the harm to writers would be irreparable. Absent preliminary relief, Paramount can quickly integrate Warner Bros.' operations, staff, and creative infrastructure, shut down projects, terminate independent creative leadership, and absorb Warner Bros.' competitively sensitive information about writer compensation. Allowing integration to proceed would make the Transaction's harm to competition virtually impossible to unwind and would render any eventual divestiture remedy ineffective. Against this backdrop, preserving the status quo is necessary to ensure that Paramount cannot render this case moot by consuming its target and substantially lessening competition before a court can rule. *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1277 (E.D. Pa. 1987); *see also Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("[A] lessening of competition constitutes an irreparable injury.").

Third, the balance of equities favors an injunction because of the public interest in preserving competition, and the imminent threat of writers suffering competitive harm from lost employment opportunities, suppressed compensation, and narrowed creative possibilities that would result from the Transaction. Moreover, any harm Defendants may suffer from delayed closing is "self-inflicted" as a result of their own bargained-for agreement. *Epic Games, Inc. v. Apple Inc.*, 2020 U.S. Dist. LEXIS 154231, at *8 (N.D. Cal. Aug. 24, 2020) (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020)).

And last, the public interest favors an injunction because "[i]t is competition . . . that [the antitrust laws] recognize as vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000). Further, preserving the status quo protects the Court's ability to order effective relief, including divestiture, at the conclusion of the case. *United States v. Acorn Eng'g Co.*, 1981 U.S. Dist. LEXIS 13943, at *2, *7 (N.D. Cal. June 18, 1981).

For all of these reasons, and as set forth more fully below, this Court should issue an Order to protect its independent authority to remedy violations of the antitrust laws. The Court should grant Plaintiffs' motion.

## II.    BACKGROUND

### A.    PLAINTIFFS THE WGAW AND THE WGAE

Plaintiffs the WGAW and the WGAE, together the WGA, represent professional writers who write literary material for television shows, movies, news programs, documentaries, animation, and new media. The WGA's mission is to protect the creative and economic interests of writers, and it brings this lawsuit to prevent the harm to writers that would result from the Transaction. Compl. ¶ 219.[4] The writer-declarants, each a WGA member, describe their potential injuries firsthand. Mulroney Decl. ¶¶ 7, 18; Koepp Decl. ¶¶ 9, 20; McKay Decl. ¶ 10; Schur Decl. ¶ 23; Ryan Decl. ¶ 17. Further, the requested injunctive relief "will inure to the benefit" of every WGA member harmed by the Transaction. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The WGA also brings suit on its own behalf because it will be directly injured by the reduction in Guild dues revenue as the result of reduced writer compensation, and because it has been required to expend significant resources to combat the harms of this proposed Transaction. Compl. ¶ 221.

### B.    WGA WRITERS BENEFIT FROM COMPETITION AMONG MAJOR STUDIOS

Writers are a critical component of the entertainment industry. When studios compete for a writer's work, that writer can command a fair wage, keep her creative voice, and build a career. Compl. ¶ 8; Mulroney Decl. ¶¶ 18–21; Koepp Decl. ¶¶ 7–10; McKay Decl. ¶¶ 10–12; Ryan Decl. ¶ 15; Schur Decl. ¶¶ 10–11. When competition is eliminated, so is the writer's leverage. As a result, a writer's remaining choice is whatever is on the table or no offer at all. Mulroney Decl. ¶ 7; Ryan Decl. ¶ 15. A concentrated industry pays writers less and decides, quietly and by default,

---

[4] The WGA has "standing to bring suit on behalf of its members" because "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the WGA] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Each prong is met here.

whose stories are told. Compl. ¶¶ 1, 11–13; Koepp Decl. ¶¶ 10, 20; McKay Decl. ¶¶ 10–12.

## C.    MAJOR STUDIOS DECIDE WHICH STORIES GET TOLD

To get produced, every script must cross the desk of a studio executive with the money and machinery to bring it to life. Five companies dominate the theatrical film industry: Paramount, Warner Bros., Disney, NBCUniversal, and Sony (the "Big Five"). Compl. ¶ 3; Lerner Decl. Ex. A ¶¶ 1, 96; Emch Decl. ¶¶ 16, 21–22 (collecting evidence).

Paramount and Warner Bros. are among the most powerful members of this group, representing 15% and 20% respectively of all big budget ($100+ million) film releases. Emch Decl. ¶ 86, fig. 14. Their size and vertically integrated structures allow them to control the entire pipeline from a writer's pitch to a fully realized film. Compl. ¶¶ 3, 63–65, 79, 84; Lerner Decl. Ex. A ¶ 96; Emch Decl. ¶¶ 21–22 (collecting evidence). A vertically integrated film studio, for example, can "finance large-scale productions; employ thousands of workers across specialized crafts; coordinate complex logistics involving visual effects and soundstage engineering; [] consistently launch nationwide theatrical releases," "operate[] its own in-house global theatrical distribution entities," and either owns "a proprietary full-scale streaming service" or otherwise "licenses extensively to third-party platforms." Compl. ¶¶ 64–65; Mulroney Decl. ¶¶ 10–11. Leadership from Paramount and Warner Bros. explains this strategy plainly: Warner Bros. has described its library's purpose as "feeding our own platforms" so that they may "keep premium content exclusively on our platform for a very long time." Lerner Decl. Ex. B at 4; *see also* Lerner Decl. Ex. C at 12 (Paramount's former CEO: "What we're going to do is we're going to put the first season of *Tulsa* on CBS prior to the second season of *Tulsa* dropping on Paramount+, really using it as a broad marketing engine.").

When a vertically integrated studio passes on a project, the writer does not lose just one buyer. The writer loses an entire ecosystem: the theatrical wide release and the streaming service all at once, the entire walled garden. Compl. ¶¶ 13, 186.

## D.    RECENT ENTERTAINMENT INDUSTRY CONSOLIDATION

Over the past few decades, and accelerating more recently, the entertainment industry's

competitive structure has diminished due to two reinforcing trends: horizontal consolidation and vertical integration. As separate companies, "Paramount and Warner Bros. currently operate as distinct buyers with distinct creative identities, taste profiles, and executive teams. They compete directly for writing talent and for projects, bidding directly against each other for the same writers and the same pitches." Schur Decl. ¶ 23. This competition empowers writers to "extract improved terms[] and secure creative commitments that neither studio would offer uncontested." *Id.* But this dynamic has been collapsing under the weight of the industry's horizontal consolidations through mergers, including Paramount/Skydance, Disney/Fox, and Discovery/WarnerMedia, among many others. Compl. ¶¶ 10, 16, 94–97; Mulroney Decl. ¶ 7 ("The primary driver [lowering writer compensation] is consolidation: as the number of independent buyers has shrunk, so has the competitive pressure that historically pushed quotes upward."). At the same time, these massive conglomerates have acquired their way to wield control over every part of film production— making them some of the only companies capable of building big budget, wide-release films, which represent unique opportunities for screenwriters. Mulroney Decl. ¶¶ 10–11 ("[A] studio's ability to guarantee a project a home is a threshold consideration, not a secondary one.").

The trends fed each other: horizontal acquisitions handed the surviving company still more distribution pipes to fill with its own content while studios that are vertically integrated become more voracious acquirers. *Id.* ¶¶ 91–94. Screenwriter David Koepp describes a market that had nearly 20 viable buyers with the financing and infrastructure to make and distribute a film in the early 2000s. Koepp Decl. ¶ 7. Today, that universe has contracted to only a handful of companies, which has had a material adverse effect on writers. *Id.* ¶¶ 7, 9. Screenwriter Adam McKay also describes a sharp contraction in the market for speculative screenplays ("spec scripts"), which are scripts written without any prior request or payment from a studio. Before, a spec script would have drawn a bidding war. McKay Decl. ¶¶ 7–8. But today, he notes it would likely draw interest from, at most, a single buyer, eliminating a writer's leverage and forcing him to accept whatever terms are presented to him. *Id.* ¶ 10. Increased concentration has also bred tacit coordination even in the absence of express collusion. Studios have adopted informal compensation benchmarking as

a standard practice. At least one studio has "routinely contact[ed] a writer's former employers to ascertain what the writer had previously been paid to anchor future offers below competitive rates." Compl. ¶ 208. Disney's recent acquisition of 21st Century Fox demonstrates how these trends are mutually reinforcing. Disney acquired Fox in a $71 billion deal in 2019, a horizontal acquisition that layered directly on top of Disney's existing vertical control of ABC, Hulu (partial), and Disney+. Compl. ¶¶ 10, 95, 97. This merger did not deliver on Disney's promise of "more great content." Lerner Decl. Ex. D. Indeed, it had the opposite effect. Before the merger, Disney and Fox's 20th Century label released an average of 25.6 wide-release films a year; afterward, the number fell to 12.6, even excluding the pandemic years. Compl. ¶ 149; Lerner Decl. Ex. E. The 20th Century Fox label alone went from roughly 15 feature films per year to around five, the majority of which was franchise or legacy material rather than the original storytelling the label was once known for. Compl. ¶¶ 150–51; Lerner Decl. Ex. E; *see also* Lerner Decl. Ex. A ¶¶ 81–82 (declining output after Disney-Fox). Dr. Eric Emch's analysis confirms this output reduction: the number of films released by Disney-Fox dropped by 35.5%, from 31 films during all of 2015–2018, to 22 films during 2022–2025. Emch Decl. ¶ 75, fig. 9. And average annual screen earnings by screenwriters writing for WGA-covered blockbusters also dropped from 2016–2018 to 2022–2025. *Id.* at ¶ 77, fig. 10 (calculating drop in average annual screen earnings).

The writer-declarants independently describe how this diminution of competition impacted them. David Koepp explains from the film-financing side: "The buyer that Fox represented did not migrate to Disney. It disappeared." Koepp Decl. ¶ 17. Adam McKay describes it in terms of lost creativity: "Disney had a well-established mandate favoring content that affirmed mainstream American values," while "Fox had a greater appetite for adult, morally complex material," and "[t]he merger didn't blend those identities. It absorbed Fox into Disney's mandate." McKay Decl. ¶ 15; Mulroney Decl. ¶¶ 14–17; *see also* Schur Decl. ¶ 30. In short, the merger eliminated an important source of innovation: original, creatively risky material. Koepp Decl. ¶¶ 16–18.

E.    **THE PROPOSED TRANSACTION AND ITS LIKELY IMMEDIATE ANTICOMPETITIVE EFFECTS**

Paramount now seeks to do to Warner Bros. what Disney did to Fox, but on a much larger

15

scale. The Transaction would combine two of the largest film studios into the world's largest buyer of scripted content, eliminating a critical source of competition for writers. The loss of horizontal competition is made worse by the vertical integration of the two studios operating together. The resulting behemoth would control a massive 35% market share of all writing jobs on big budget ($100+ million) anticipated top grossing films, triggering the presumption of illegality based on market share alone.[5] Emch Decl. ¶ 86, fig. 13. Moreover, the Transaction rests on a debt-scheme that includes approximately $79 billion in liabilities and a balance sheet that all but guarantees pressure to cut costs rather than expand output. Compl. ¶¶ 15, 159. Indeed, the merging parties have targeted $6 billion in "synergies," which precedent suggests means layoffs. Lerner Decl. Exs. F at 3, G. This result is nothing new: previous mergers from both Paramount and Warner Bros. resulted in significant layoffs and abandoning projects in development. Compl. ¶ 16 (post-merger Paramount-Skydance combined entity eliminated about 10% of its workforce and abandoned active programs as well as projects under development); Schur Decl. ¶¶ 14–15 (Viacom/CBS merger eliminated writing jobs and projects).

Paramount and Warner Bros. will ask this Court to take on faith alone that none of this will matter, that the combined company will still release at least 30 theatrical films per year, and somehow expand opportunity for writers across the industry.[6] History, and industry reality, say otherwise. No studio, including Paramount and Warner Bros. individually, has ever released more than 20 films theatrically in a single year. *Id.* ¶ 155. Projecting a historic acceleration of theatrical output while taking on enormous debt defies logic. And a combined company has no reason to cannibalize its own revenues by releasing films simultaneously on a fixed theatrical release calendar while keeping both slates fully staffed, fully funded, and fully competing for the same audience. *Id.* David Koepp explains this using one familiar dynamic: the historical practice of

---

[5] The combined entity's market share in anticipated top grossing films ranges from 30% up to 41% based on two different measures of market share, two different time periods, and three different budget thresholds for "anticipated top grossing film." Emch Decl. ¶ 86, fig. 13, ¶ 88, fig. 15, ¶ 90, fig. 17.

[6] *See* Defs.' Opp. to Pls.' Mot. TRO at 15, ECF No. 114, *State of California, et al. v. Paramount Skydance Corp. and Warner Bros. Discovery, Inc.*, No. 4:26-cv-7116 (N.D. Cal. July 16, 2026).

"dueling productions," in which two studios race to make competing versions of similar material, such as volcano movies (*Volcano* / *Dante's Peak*), kid-friendly bug comedies (*Antz* / *A Bug's Life*), asteroid films (*Deep Impact* / *Armageddon*), and political action thrillers (*Olympus Has Fallen* / *White House Down*). Koepp Decl. ¶ 23; Compl. ¶ 157. This contest "generate[s] more work, better compensation, [and] greater creative output" precisely because two independent buyers are competing. *Id.* A merged entity "would have no financial incentive to sustain two competing versions of overlapping projects. It would simply kill one." *Id.*

Every one of these anticompetitive effects lands on WGA members and then reverberates throughout the industry.

## F. FEDERAL AND STATE REVIEW OF THE TRANSACTION

On February 27, 2026, Paramount announced a definitive agreement to acquire Warner Bros. for $110.9 billion. Compl. ¶ 98. Over the following months, U.S. Department of Justice ("DOJ") staff investigated the transaction's likely competitive effects. On June 12, 2026, without requiring any divestitures or other concessions from Paramount, DOJ's political leadership publicly announced that no enforcement action would be taken. Lerner Decl. Exs. H, I.

The States, concurrent with the DOJ investigation, conducted their own review which reached a different conclusion. On July 13, 2026, twelve States, led by California, filed suit to block the Transaction. Lerner Decl. Ex. A. The States allege the merger would harm competition in three markets: distribution of wide-release theatrical films, distribution of anticipated top grossing films[7], and licensing of basic cable television channels to distributors. *Id.* ¶¶ 37–68. The States requested the merging parties stipulate to an injunction prohibiting them from closing or consummating the Transaction while the Court adjudicates their request for a preliminary injunction; Defendants refused. Lerner Decl. Ex. J at 3. The States accordingly moved for a temporary restraining order and order to show cause why a preliminary injunction should not issue, and asked the Court to rule before 11:59 p.m. Eastern on July 21, 2026, before the July 22 date Paramount indicated it may close the Transaction. *Id.* at 2. The Court granted the motion for a

---

[7] The WGA essentially alleges the same relevant market but focuses on the upstream harm to writers while the States address the downstream harm to theaters.

temporary restraining order on July 20, prohibiting the parties from consummating the transaction. Order, ECF No. 141, *State of California, et al. v. Paramount Skydance Corp. and Warner Bros. Discovery, Inc.*, No. 4:26-cv-7116 (N.D. Cal. July 20, 2026) ("TRO").

## III.   LEGAL STANDARDS

The Court may issue a preliminary injunction if Plaintiffs show that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These factors are evaluated on a "sliding scale" such that a plaintiff may obtain a preliminary injunction if it raises "serious questions" going to the merits while showing that the balance of hardships tips "sharply" in the plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). Plaintiffs amply demonstrate that the Transaction would substantially lessen competition in the relevant market, thereby inflicting irreparable harm absent relief. Moreover, the balance of the equities favors an injunction, which will preserve the status quo and allow the Court to offer meaningful relief at the close of the litigation, which serves the public interest.

## IV.   ARGUMENT

## A.   THE WGA IS LIKELY TO SUCCEED ON THE MERITS

The WGA is likely to prevail on its claim that the "effect" of the Transaction "may be substantially to lessen competition" in the market for writing services on WGA-covered anticipated top grossing films. 15 U.S.C. § 18. To prevail, the WGA need only demonstrate that the merger creates a "**reasonable probability** of anticompetitive effect," such as lower or stagnant wages, fewer or worse job opportunities, or decreased quality of creative projects. *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (emphasis added).[8] Under longstanding

---

[8] A buyer's market power over sellers, i.e., monopsony power, is analyzed under the same legal framework as a seller's market power over buyers, i.e., monopoly power. *Bertelsmann*, 646 F. Supp. 3d at 22 n.13 (citing *United States v. Syufy Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320, 322 (2007)). However, the Court assesses the "mirror image" of the effects; for example, instead of considering

precedent, a merger that would result "in a significant increase in the concentration of firms in [any] market" establishes a presumption that the merger "is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363; *In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *44 (E.D. Cal. Apr. 17, 2026) (same). The Supreme Court has held that "[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." *Phila. Nat'l Bank*, 374 U.S. at 364. This presumption can also be satisfied using HHI calculations. *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 786 (9th Cir. 2015) ("*St. Luke's*").

The 2023 Merger Guidelines consider a merger presumptively illegal if two conditions are met: (1) market concentration exceeds 30% or 1,800 HHI, and (2) the transaction creates a change in HHI greater than 100. Merger Guidelines § 2.1.[9] However, the Merger Guidelines further note that the "level of concentration at which competition concerns arise **may be lower in labor markets** than in product markets, given [their] unique features," including that "labor markets often exhibit high switching costs and search frictions," and that "employers often have specific demands for the experience, skills, availability, and other attributes they desire in their employees." *Id.* § 2.10 (emphasis added). As more fully discussed herein, not only does the Transaction exceed the thresholds needed to be presumptively unlawful, the merger would eliminate head-to-head competition between close rivals, and direct evidence shows that it would lead to fewer jobs, lower compensation, fewer projects, and diminished creative opportunities for

whether a merger of sellers could raise prices on buyers, here, the Court considers whether a merger of buyers of labor can impose "compensation that was materially lower." *Todd v. Exxon Corp.*, 275 F.3d 191, 197, 202 (2d Cir. 2001) (Sotomayor, J.); *Bertelsmann*, 646 F. Supp. 3d at 23 (enjoining merger of competing buyers that would result in "lower advances for the authors" of anticipated top-selling books).

[9] "Although the Merger Guidelines are not binding on the courts, they are often used as persuasive authority." *St. Luke's*, 778 F.3d at 784 n.9 (citations omitted). The current Merger Guidelines' thresholds for the structural presumption are not new; the 1992 and 1997 Merger Guidelines had the same, which were adopted by courts. *E.g.*, *FTC v. Staples*, 970 F. Supp. 1066, 1082 (D.D.C. 1997) (applying 1,800 threshold for presumption and "the Court will use that guidance here.").

writers. These anticompetitive effects are sufficient to enjoin the merger, *Bertelsmann*, 646 F. Supp. 3d at 23, 32, and are more than enough to raise "serious questions" about the WGA's claims, *A Woman's Friend Pregnancy Res. Clinic*, 901 F.3d at 1167.

Once Plaintiffs have met their prima facie showing of illegality, the burden shifts to Defendants to rebut it. *Boardman*, 822 F.3d at 1021 (presumption may be rebutted by "cast[ing] doubt on the accuracy of the [plaintiff's] evidence as predictive of future anticompetitive effects." (citation omitted)). Defendants cannot rebut the presumption here given the absence of any offsetting procompetitive effects to writers in this relevant market that could justify a merger with the breadth of anticompetitive effects likely to follow this Transaction.

### i. The Relevant Market for Writing Services on WGA-Covered Anticipated Top Grossing Films

A threshold consideration for the Clayton Act is to determine "the relevant product and geographic markets." *St. Luke's*, 778 F.3d at 783 (internal quotation marks omitted) (citations omitted). The "relevant product market identifies the product[s] and services with which the defendants' products compete," and a "relevant geographic market identifies the geographic area in which the defendant competes in marketing its products or service." *Sysco*, 113 F. Supp. 3d at 24 (internal quotation marks omitted) (citations omitted). The "traditional way to define a relevant market in the monopsony context would be to examine 'the commonality and interchangeability of the buyers' of a certain good." *Bertelsmann*, 646 F. Supp. 3d at 34 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 197, 202 (2d Cir. 2001) (Sotomayor, J.)). To determine a relevant market, "[c]ourts often look to 'practical indicia' of market boundaries to identify whether two products are economic substitutes and compete within the same antitrust market," such as by looking to the testimony of industry participants. *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 414 (S.D.N.Y. 2024) (the "*Brown Shoe* factors") (citation omitted); *see also Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766–68 (9th Cir. 2001) (relying on *Brown Shoe* factors alone in review of district court's determination of relevant market). Here, Plaintiffs have

identified a relevant market for writing services for WGA-covered [10] anticipated top grossing films in the United States. Emch Decl. ¶¶ 45–82; Compl. ¶¶ 108–14.

Writing services for WGA-covered anticipated  top grossing theatrical films constitute a distinct relevant market because the compensation structure, budget, skills, creative demands, commercial scale, and distribution expectations that define those projects (and the writing services they require) are not reasonably interchangeable with other writing projects, such as television or limited-release, independent, or direct-to-streaming films. *See Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994–95 (9th Cir. 1986) (considering these indicia). For example, industry participants explain that screenwriting is distinct from writing for television because "screenwriting builds every element toward a single, self-contained experience with no narrative obligations beyond its own ending," whereas "episodic television writing requires developing characters and stories across episodes and seasons of the series." Compl. ¶ 116; *see also* Koepp Decl. ¶ 14 ("Screenwriting is as different from television writing as a city is from a pair of socks."). As a result, the compensation structure for screenwriters differs markedly from the compensation structure for television writers. Compl. ¶¶ 108–14; Emch Decl. ¶ 53 (collecting evidence)*; see Brown Shoe Co.*, 370 U.S. at 325 ("industry or public recognition," "peculiar characteristics and uses," and "distinct prices" are among "practical indicia" indicating the boundaries of a market).

Writing services for anticipated top grossing films is further distinguished from those for limited-release, independent, and direct-to-streaming films, because   top grossing films occupy a distinct category that shapes the creative brief and writer compensation. Compl. ¶¶ 109–10. anticipated top grossing films command significantly higher splits of box office revenue for studios, more frequent mandatory placement in premium-format auditoriums, and longer guaranteed booking periods than other releases. *Id.*; Lerner Decl. Ex. A ¶¶ 55, 58. As a result,

---

[10] Writing services for WGA-covered anticipated top grossing films are not reasonably interchangeable with those for non-WGA-covered projects, such as animation writing. Animation writing requires a different expertise and is generally paid less than live action, making such jobs not a close substitute for big-budget live action film writing services. Emch Decl. ¶ 62–66.

writers for anticipated top grossing films typically earn higher compensation compared to other types of screenwriting, including the greater possibility of writer participation in the financial success of the project through residuals and potential profit participation. Emch Decl. ¶ 52; Mulroney Decl. ¶¶ 11–12; Compl. ¶¶ 109–10; *Brown Shoe Co.*, 370 U.S. at 325. The industry press, including *Variety*, *Deadline*, and *The Hollywood Reporter*, recognize "anticipated" or "expected blockbusters" as a distinct sort of cultural product. Compl. ¶ 114; *Brown Shoe Co.*, 370 U.S. at 325 ("public recognition" indicative of market). The films are characterized by higher budgets, event-level marketing, and campaigns designed to attract audiences across all major demographics, Lerner Decl. Ex. A ¶ 53, as well as the ability to enhance the writer's overall profile by including "famous stars, directors and producers, booking in first class theatres, and lucrative terms offered for the pictures by exhibitors," *Syufy Enters.*, 793 F.2d at 994–95 (affirming market of "industry anticipated top grossing motion pictures"); *Bertelsmann*, 646 F. Supp. 3d at 33 (analogizing downstream market for anticipated top grossing films in *Syufy* to upstream market for anticipated top-selling books).

Theatrical release is also a defining characteristic of the market. Emch Decl. ¶¶ 46, 51–52. As David Koepp stated, "a streaming release generates attention for perhaps a week, and then it vanishes. In contrast, a theatrical film that connects with audiences lingers." Koepp Decl. ¶ 13. Wide theatrical release matters for concrete, compensable reasons too: it generates cultural conversation and triggers a cascade of downstream markets (streaming, international distribution, and others) from which writers earn residuals. Mulroney Decl. ¶¶ 10–12. A film that skips theatrical release forecloses that long tail of compensation. *Id.* ¶ 12. The Big Five recognize this importance. After experimenting with concurrent theatrical and streaming release of big-budget films in the wake of the COVID pandemic, and the simultaneous entry of new streaming platforms, the Big Five have migrated back to theaters. Emch Decl. ¶¶ 55–56, fig. 4. Streaming-only platforms, such as Netflix, recognize this difference in business model. Compl. ¶ 69 (Netflix co-CEO: "Driving folks to a theater is just not our business"); *see Brown Shoe Co.*, 370 U.S. at 325 ("industry or public recognition," "peculiar characteristics and uses," and "distinct prices"

among "practical indicia" indicating boundaries of market). [11] Due to language and cultural specificity, union coverage, and the focus of the dominant studios, the relevant geographic scope is the United States. Compl. ¶¶ 133–36; Lerner Decl. Ex. A ¶¶ 60–61; Emch Decl. ¶ 82; *see also* Schur Decl. ¶ 7 (writing subject to MBA); McKay Decl. ¶ 22 (U.S. buyers distinct from European ones).

### ii.    The Transaction Is Presumptively Unlawful

Once a relevant market is defined, courts examine whether the proposed merger has a "reasonable probability of anticompetitive effect." *Warner Commc'ns*, 742 F.2d at 1160. Here, the proposed Transaction is presumed to have anticompetitive effects because of the staggering increase in market concentration it would cause, by reference to either traditional market share or HHI calculations. *In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *43 (structural presumption met under either calculation); *FTC v. Kroger Co.*, 2024 U.S. Dist. LEXIS 223077, at *56–57 (D. Or. Dec. 10, 2024) (same).

First, a combined Paramount-Warner Bros. would trigger the presumption of illegality based on market shares alone. The merger would give the combined entity a share of 35% for writing jobs for WGA-covered anticipated top grossing films. Compl. ¶ 172; Emch Decl. ¶ 86, fig. 13. The proposed Transaction would also exceed 30% in this relevant upstream labor market, and thus is **presumed** to violate the Clayton Act. *Phila. Nat'l Bank*, 374 U.S. at 364; *In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *44–45. Courts have enjoined transactions with lower market concentration. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 71–72 (D.D.C. 2011) (combined firm would have 28.4% market share); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (combined firm would have 26% market share); TRO at 5 (27% combined market share).

---

[11] Public commitments by Amazon to dramatically expand its theatrical output should be given limited weight, given that prior commitments have not fully materialized. Emch Decl. ¶ 94 n.127. For example, in 2022, Amazon stated it would spend $1 billion annually to fund 12–15 theatrical releases per year, yet released only 4–5 annually between 2023-2025. *Id.* Just one exceeded a $100 million production budget. *Id.*

Second, the Transaction exceeds the HHI thresholds triggering the presumption of illegality, which courts use as a separate economic tool for measuring market concentration. Under the Merger Guidelines, a market is "highly concentrated" if its HHI exceeds 1,800 and the merger is presumptively unlawful if it results in an "increase in the HHI of more than 100 points." *Id.*; *see also Tapestry*, 755 F. Supp. 3d at 459 (generally, an increase in HHI of "more than 100 points" in a "highly concentrated market" creates a presumption of illegality); *Kroger*, 2024 U.S. Dist. LEXIS 223077, at *56–57 (same). This threshold may be lower in labor markets, given their special characteristics and the importance a job has to a worker. Merger Guidelines § 2.10.

The Transaction would increase market concentration in the relevant labor market by 408 points, leading to a post-merger HHI of 2,172, a highly concentrated market. Compl. ¶ 172; Emch Decl. ¶ 86, fig. 13. Courts have found mergers unlawful when they increase market concentration by smaller amounts. *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 138 & n.33 (D. Mass. 2024) (enjoining merger where plaintiff identified 183 passenger routes where HHI increase exceeded 200); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (HHI increase of approximately 400).

### iii.    The Transaction Will Eliminate Head-to-Head Competition

The Transaction is also illegal because it would "eliminate[] head-to-head competition between close competitors," which will "result in a lessening of competition." *Sysco*, 113 F. Supp. 3d at 61; *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 382–83 (S.D.N.Y. 2023) (same; collecting cases). Here, there is no serious doubt that Paramount and Warner Bros. directly compete for projects and screenwriters, competition that would be permanently foreclosed by the Transaction if consummated. Compl. ¶¶ 8, 190; *see also* Lerner Decl. Ex. A ¶¶ 4–5, 75, 78, 87 (similar). Paramount and Warner Bros. "actively compete . . . as primary buyers of scripts, writing services, and other creative work," and eliminating that rivalry would harm screenwriters for anticipated top grossing films, in addition to other labor markets. Compl. ¶ 190. This type of rivalry regularly plays out to the benefit of screenwriters. For example, Zach Cregger and Brian Duffield recently benefited from the bidding wars between Paramount and Warner Bros., among

other studios, for *Siren Head*. This type of competition "generate[s] more work, better compensation, [and] greater creative output" precisely because two independent buyers are competing against each other. Koepp Decl. ¶ 23. That competition also materializes through dueling productions released during the same theatrical windows: "targeting the same audience during peak periods, forcing each studio to compete on quality, marketing, and audience appeal." *Id.* ¶ 157. For example, Paramount's forthcoming *Sonic the Hedgehog 4* is slated to open just one week before Warner Bros.' *Godzilla x Kong: Supernova*, both "competing for the same family and action-tentpole audience window." *Id.* Eliminating this rivalry, as has occurred after the Disney/Fox merger, would deprive screenwriters of the competition they rely on to negotiate higher compensation and deal terms. *Id.*

### iv.    Evidence Confirms that the Transaction Will Have Anticompetitive Effects

Because the WGA has established its prima facie case, Plaintiffs need not make any separate showing of likely anticompetitive effects. *Phila. Nat'l Bank*, 374 U.S. at 363 (holding that the presumption "dispens[es]" with "elaborate proof of market structure, market behavior or probable anticompetitive effects"). However, evidence also demonstrates that there is a "reasonable probability," *Warner Commc'ns*, 742 F.2d at 1160, that Paramount "will have the incentive to raise prices [here, lowering compensation] or reduce quality." *H&R Block*, 833 F. Supp. 2d at 81; *see also Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1299 (W.D. Wash. 2019) ("Explicit or implicit evidence that the merging parties intend to raise prices [lower or stagnate compensation], reduce output or capacity [fewer jobs], reduce product quality or variety can be highly informative in evaluating the likely effects of a merger."). In evaluating the evidence, a court need not credit Paramount's self-serving promises of increasing theatrical output; these are not consistent with market competition and do not counteract the likely anticompetitive effects present here. *H&R Block*, 833 F. Supp. 2d at 82 (holding that even if "the Court has no reason to doubt that defendants would honor their promise" to maintain the acquired firm's current prices for three years post-merger, "this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case."); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir.

2001) (discrediting "mere speculation and promises about post-merger behavior"); *see also Bertelsmann*, 646 F. Supp. 3d at 50 ("[T]he proposed policy would not be profit-maximizing and is thus unreliable evidence of future conduct . . . a unilateral promise [] that it will not use its market power . . . cannot rebut the [plaintiff's] prima facie case." (citing 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 964b (4th ed. 2014)). Indeed, writers have encountered such "broken promises" from mega-mergers before. Lerner Decl. Ex. K. Past mega-mergers, similar to the proposed Transaction between Paramount and Warner Bros., have promised more competition in the industry and greater choice, but, instead, have resulted in many of the same anticompetitive harms anticipated here: reduced creative diversity, stagnant writer pay, layoffs, and consolidated market power.

Nonetheless, the merger's anticompetitive effects are clear and imminent. The merger will enable Paramount to pay writers less, to eliminate writing jobs, and reduce the number and creative variety of writing projects, particularly for anticipated top grossing films.

### 1) The Merger Will Lead to Fewer Writer Jobs and Lower Compensation

The merger is likely to have anticompetitive effects because it will "likely lead [studios] to make lower [compensation] offers" to screenwriters for anticipated top grossing films. *Bertelsmann*, 646 F. Supp. 3d at 48; *see also H&R Block*, 833 F. Supp. 2d at 81 (merger would give combined entity "the incentive to raise price [lower compensation]"). The Transaction will increase Paramount's bargaining power to impose stagnant or lower wages because it would allow Paramount to purchase another major buyer of writing services, one that previously acted as a check on its ability to suppress writer compensation. Compl. ¶ 190; Emch Decl. ¶ 98, 100; *see St. Luke's*, 778 F.3d at 786–87 (affirming finding that merger would likely have anticompetitive effects where it would increase the merging parties' bargaining position). A screenwriter's only leverage to negotiate higher compensation is the power to walk away and choose a competing employer. Compl. ¶ 113; Emch Decl. ¶ 98. After the merger, with Warner Bros. eliminated as an independent competitor, that choice will be to accept the lower pay, or not work at all.

Writers have seen this play out before. Across decades of experience, writers describe the same arc: as the number of independent buyers of their work has contracted through prior mergers and consolidation, their ability to force competing bids, and therefore earn higher compensation, has diminished. When David Koepp brought *Panic Room* to market in 2001, **19** financing entities were viable buyers, and three studios entered into a genuine bidding war. Koepp Decl. ¶¶ 7–8. Koepp explains that "[i]f I brought the same script to market today, I would have meaningfully fewer options," because "[t]he universe of studios capable of making a glossy, star-driven film at a healthy budget has contracted to only a handful of companies." Koepp Decl. ¶ 9. If this merger is consummated, that number falls even further. In the words of Adam McKay, this would effectively mean "lights out" for the industry, "devastating it economically and culturally." McKay Decl. ¶ 18. Other writers tell the same story. Shawn Ryan explains that "[i]f only one studio is interested in purchasing the writer's work, the studio does not need to worry about competition from other studios and can purchase the writer's work on less favorable terms, such as lower compensation." Ryan Decl. ¶ 15.

The writers corroborate Dr. Emch's economic opinion that eliminating one of a small number of buyers creates a monopsonistic effect, where a smaller pool of buyers exerts downward pressure on wages, compensation structures, overall deal terms, and other transaction terms. Emch Decl. ¶¶ 96–100. Further, the market already has the "structural preconditions for tacit coordination, and [it] already exists to a meaningful degree." Compl. ¶ 208. For example, each major studio easily "tracks the others' output decisions, release schedules, and talent acquisitions closely and continuously," and the "market is small enough that [each studio's] own decisions will affect its rivals, and that its rivals' responses will in turn affect it." *Id.* ¶ 207. Compensation suppression and coordination are mutually reinforcing in such a concentrated market. The merger would exacerbate anticompetitive practices without need for explicit agreement—including "informal compensation benchmarking" that anchors offers below competitive rates, and related practices. *Id.* ¶¶ 208–11. Increasing concentration "makes it easier for firms in the market to collude, expressly or tacitly, and thereby force price[s] above or farther above [or drive

compensation below or further below] competitive levels." *Heinz*, 246 F.3d at 724–25 (internal quotation marks omitted) (citation omitted); *see also* Merger Guidelines § 3 (concentration increases likelihood of coordination).

The merging parties offer no credible answer to the serious concern that the Transaction will substantially lessen competition. Paramount's Chairman and CEO, David Ellison, has already promised to identify about $6 billion in synergies, stating: "**we will absolutely have to rationalize the overall corporate overhead of the company**." Lerner Decl. Ex. F at 4. If recent merger history is prologue, those synergies will include massive layoffs, including a reduction in writing services. As Schur notes, the ViacomCBS merger (which became Paramount) caused the company to cut writing jobs and projects, including through internal consolidation. Schur Decl. ¶¶ 14–15; *see also* Compl. ¶¶ 16, 214 (previous Paramount/Skydance and Warner Bros./Discovery mergers resulted in massive layoffs). The industry already recognizes the inevitability of these effects, as one industry analyst noted: "I don't remember any instance with consolidation where one plus one equals two." Compl. ¶ 156; Lerner Decl. Ex. L.

### 2) The Merger Will Reduce the Quality and Variety of Writing Projects

Writers will not only be paid less, but they will also have fewer creative options for their work. *United States v. Anthem, Inc.*, 855 F.3d 345, 366 (D.C. Cir. 2017) ("[The] assumption that the prices paid by consumers (regardless of the quality of the resulting product) are the sole focus of antitrust law is flawed."); Merger Guidelines § 4.2E (recognizing loss of quality and variety as anticompetitive effects); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("reduced output" can include "decreased quality in the relevant market," which is "proof of actual detrimental effects on competition"). In screenwriting, "quality" and creative "variety" directly result from studios competing to buy and produce different kinds of stories. This includes Paramount and Warner Bros., who currently compete head-to-head. Emch Decl. ¶ 92–95; *supra* Section IV.A.iii. When one of those competing buyers is eliminated, its creative mandate will be extinguished.

The Disney-Fox merger is the clearest example of how this dynamic plays out in practice. *Supra* Section II.D. This history would repeat, at greater scale, if Paramount and Warner Bros. combine. David Koepp warns that "[w]hen two studios merge, those identities do not coexist within the new entity. One displaces the other." Koepp Decl. ¶ 22. He also identifies a related, concrete loss of variety: A merged entity "would have no financial incentive to sustain two competing versions of overlapping projects. It would simply kill one." Koepp Decl. ¶ 23; Compl. ¶ 157.

This means that, in addition to being paid less for their work, writers will also be limited in the kinds of stories they can tell—and which stories American audiences will ultimately receive. This reduction in quality and variety constitutes additional direct anticompetitive effects of the Transaction. *Am. Express*, 585 U.S. at 542.

### v.    The Merging Parties Cannot Rebut the Prima Facie Case

Because the WGA has met its prima facie burden, the transaction is presumptively unlawful and the burden shifts to the merging parties to rebut the presumption. They cannot.

The Supreme Court has stated that "[p]ossible economies cannot be used as a defense to illegality," *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967), so courts typically look with skepticism at attempts to justify an anticompetitive merger based on anticipated "efficiencies," *see St. Luke's*, 778 F.3d at 788–90 (expressing doubts); *see also Procter & Gamble Co.*, 386 U.S. at 580 ("Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition."). Even assuming *arguendo* that an efficiencies defense is available to Defendants, they cannot rely on it here for at least two reasons.

*First*, courts have generally required defendants to show "proof of extraordinary efficiencies," *Heinz*, 246 F.3d at 720, that "would benefit customers" in the relevant market, *Sysco*, 113 F. Supp. 3d at 81–82. Here, that means benefits for **the writers** who would suffer the anticompetitive effects, not some separate market. TRO at 7 n.5; *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) ("[A] merger that substantially decreases competition in

one place—injuring consumers there—is not saved because it benefits a separate group of consumers by creating competition elsewhere."); *see also* Merger Guidelines § 3.3 n.71 ("The Agencies will not credit efficiencies if they reflect or require a decrease in competition in a separate market. For example, if input costs are expected to decrease, the cost savings will not be treated as an efficiency if they reflect an increase in monopsony power."). But Paramount cannot show benefits to writers to offset these anticompetitive effects. In fact, the opposite is more likely: Paramount has announced $6 billion in synergies, which prior acquisitions, including those involving Paramount, have translated to layoffs. Lerner Decl. Exs. F at 3 (Paramount CEO: "we will absolutely have to rationalize corporate overhead" as a result of the merger), G; *see also* Compl. ¶¶ 16, 214 (previous Paramount/Skydance and Warner Bros./Discovery mergers resulted in layoffs). This proposed Transaction, therefore, would not yield any cognizable "efficiency" to the writers. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 349 (3d Cir. 2016) (holding that "efficiencies . . . must not arise from any anticompetitive reduction in output or service").

*Second*, the merging parties may argue that savings from these job losses would benefit consumers in a different market, such as by lowering streaming prices. For one, it is black-letter antitrust law that "anticompetitive effects in one market [cannot] be justified by procompetitive consequences in another." *Phila. Nat'l Bank*, 374 U.S. at 370. Paramount's assertion that the merger is necessary to achieve streaming scale (and benefit consumers in that separate market) is irrelevant because streaming is not the relevant market here. *Kottaras*, 281 F.R.D. at 25 (illegal merger "not saved because it benefits a separate group of consumers"); see also TRO at 7 n.5 (out-of-market efficiencies not cognizable). And further, any purported savings to streaming consumers are entirely speculative, particularly when the very market competition that would force the merged firm to pass through savings to streaming consumers would be eliminated by the Transaction itself. *Anthem*, 855 F.3d at 366 ("Owing to the lower level of competition in highly concentrated markets, when presented with lower supply input prices, companies have a greater ability to retain for themselves the input savings rather than pass them on to consumers."). Such an "efficiencies" defense, if it even exists at all, must be "merger-specific" that cannot be achieved

except from the merger, and not "speculative or otherwise cannot be verified by reasonable means." *Heinz*, 246 F.3d at 721–22 & n.20.

## B.    WRITERS WILL SUFFER IRREPARABLE HARM FROM THE MERGER

The harm writers will suffer will be immediate, permanent, and irreversible. If Paramount and Warner Bros. are allowed to close the Transaction, it will be exceedingly difficult—if not impossible—for this Court to grant meaningful relief at the end of the litigation. *Acorn Eng'g Co.*, 1981 U.S. Dist. LEXIS 13943, at *7 (N.D. Cal. June 18, 1981) (issuing injunction to "ensure the efficacy of possible permanent relief," *i.e.*, divestiture, "after trial"). Courts have issued injunctions to preserve the competition that "existed before defendants' acquisition" and to ensure that defendants will not "bleed" the acquired entity of "substantial assets and restructure" it in such a way as to thwart a divestiture order at the end of a trial on the merits. *Tasty Baking Co.*, 653 F. Supp. at 1277; *see also Boardman*, 822 F.3d at 1023 (a "lessening of competition constitutes an irreparable injury").

Even if the Court could unwind the merger at the close of the litigation, "ultimate divestiture will not fully restore competition because [Paramount] will retain" competitively sensitive information about writer compensation. *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1086 (D.C. Cir. 1981) (Ginsburg, J.). Paramount will simply increase its "unfair advantage" in negotiations with writers, *Tasty Baking Co.*, 653 F. Supp. at 1277, by exploiting Warner Bros.' competitively sensitive data, including about wages and deal terms, to reduce compensation to writers. Sharing this competitively sensitive information would simply raise the likelihood of "increasing coordination among the remaining buyers," and subvert the very competition the Clayton Act was designed to protect. Merger Guidelines § 2.10; Compl. ¶¶ 204–08; *see Heinz*, 246 F.3d at 724–25 (market concentration increases likelihood of express and tacit collusion). Further, closing the deal means Paramount can begin to terminate Warner Bros.' creative leadership, as entertainment companies often do post-merger, Koepp Decl. ¶ 11, to eliminate perceived redundancies and to fully integrate Warner Bros. into Paramount's operations. That would immediately affect the writing projects under their tutelage, and therefore the opportunities

available to writers. These changes would be impossible to remedy should the Court ultimately conclude that the merger is unlawful. *DIRECTV, LLC v. Nexstar Media Grp., Inc.*, 2026 U.S. Dist. LEXIS 66737, at *34 (E.D. Cal. Mar. 27, 2026); *see also Acorn Eng'g Co.*, 1981 U.S. Dist. LEXIS 13943, at *7. That "would leave defendants free to swallow up a competitor, to digest it in part and, upon a court order, to regurgitate insubstantial remains. No such result is acceptable." *Tasty Baking Co.*, 653 F. Supp. at 1277.

These considerations are especially grave given that Paramount's "historical pattern" from previous mergers has been layoffs and cuts to writing projects. *In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *70; Compl. ¶ 16 ("Paramount-Skydance was the same story: following the 2025 merger, the combined company implemented a $2 billion cost-cutting plan which involved eliminating around 10% of its workforce and abandoning active programs as well as projects in development."); Lerner Decl. Ex. M at 21; Lerner Decl. Ex. N; Lerner Decl. Ex. O. This output reduction goes beyond simple numbers:  It is a permanent loss of unique, boundary-pushing creative projects that is impossible to measure with the kind of precision that monetary damages require. Harm that is "difficult to valuate" is by definition irreparable. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

## C.   THE PUBLIC INTEREST AND BALANCE OF EQUITIES TIP IN FAVOR OF AN INJUNCTION

"[B]y enacting Section 7, Congress declared that the preservation of competition is always in the public interest." *United States v. Tribune Publ'g Co.*, 2016 U.S. Dist. LEXIS 54494, at *14 (C.D. Cal. Mar. 18, 2016) (internal quotation marks omitted) (citation omitted). "It is competition . . . that [the antitrust laws] recognize as vital to the public interest." *Knevelbaard Dairies*, 232 F.3d at 988. Because the WGA adequately establishes that significant anticompetitive effects are likely to flow from the merger, "this constitutes harm to the public." *In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *78.

Further, the injunction would simply maintain the status quo, the least disruptive path for all interested parties, as it would prevent a complicated and burdensome unwinding later. Absent

an order now, the Court will lose the ability to issue meaningful relief at the end of the suit. Because the "public interest in preserving the possibility of a successful divestiture is quite strong," the public interest sharply favors preliminary relief. *Acorn Eng'g Co.*, 1981 U.S. Dist. LEXIS 13943, at *7; *In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *75.

Whatever anticompetitive, "private benefits" Paramount could earn from the Transaction are "easily outweighed by the irreparable harm" to writers and to the public interest in maintaining market competition. *In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *78 (internal quotation marks omitted) (citation omitted). Nor can the Defendants rely on any "ticking fee" to manufacture harm to themselves. For one, this self-imposed transfer of wealth from one Defendant to another does not result in any net harm. But also, this "ticking fee" was imposed by the parties on themselves. "[S]elf-inflicted wounds are not irreparable injury." *Epic Games, 2020 U.S. Dist. LEXIS 154231*, at *8 (N.D. Cal. Aug. 24, 2020) (quoting *Al Otro Lado*, 952 F.3d at 1008). Further, Defendants have also agreed that the Transaction need not close until June 2027 if antitrust review is ongoing, *see* Lerner Decl. Ex. P at 25, accepting as part of their bargain any cost of delay as a natural result of scrutiny. But regardless, "[a]ny harms defendants experience as a result of the injunction do not overcome the strong public interest in the enforcement of antitrust law, especially given the difficulty in disentangling a premature merger." *Kroger*, 2024 U.S. Dist. LEXIS 223077, at *142–43. Thus, the balance of equities and public interest favor an injunction. [12]

## V.    CONCLUSION

For the foregoing reasons, the WGA respectfully requests that the Court grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: July 21, 2026

---

[12] The Court should further decline to require a bond. "Although phrased as mandatory, in practice the Court has discretion under this Rule whether to require a bond, particularly in public interest cases." *Colorado v. DeJoy*, 487 F. Supp. 3d 1061, 1066 (D. Colo. 2020). In the alternative, the WGA requests a nominal bond of $10,000. *See In re Nexstar-TEGNA Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, at *82.

Respectfully submitted,

*/s/ Kellie Lerner*

| | |
|---|---|
| KELLIE LERNER (*pro hac vice*)<br>ELLISON A. SNIDER (*pro hac vice*)<br>BENJAMIN B. ALLEN (*pro hac vice*)<br>**SHINDER CANTOR LERNER LLP**<br>14 Penn Plaza, Suite 1900<br>New York, NY 10122<br>Telephone: (646) 960-8601<br>kellie@scl-llp.com<br>esnider@scl-llp.com<br>ballen@scl-llp.com | CHARLES J. LADUCA (*pro hac vice*)<br>N. SLADE BOND II (*pro hac vice*)<br>**CUNEO GILBERT<br>FLANNERY & LADUCA, LLP**<br>2445 M Street, NW Suite 740<br>Washington, D.C. 20037<br>Telephone: (202) 789-3960<br>sbond@cuneolaw.com |
| J. WYATT FORE (*pro hac vice*)<br>**SHINDER CANTOR LERNER LLP**<br>600 14th Street, NW<br>Washington, D.C. 20005<br>Telephone: (646) 960-8632<br>wyatt@scl-llp.com | SARAH ROONEY (*pro hac vice*)<br>**CUNEO GILBERT<br>FLANNERY & LADUCA, LLP**<br>8705 Colesville Road<br>B. 133<br>Silver Spring, MD 20910<br>Telephone: (301) 518-7428<br>srooney@cuneolaw.com |
| DAVID C. BROWNSTEIN (SBN: 141929)<br>DAVID M. GOLDSTEIN (SBN: 142334)<br>**FARMER BROWNSTEIN JAEGER<br>GOLDSTEIN SIEGEL & SHEPARD LLP**<br>155 Montgomery Street, Suite 301<br>San Francisco, CA 94104-2733<br>Telephone: (415) 962-2873<br>dbrownstein@fbjgss.com<br>dgoldstein@fbjgss.com | MICHAEL J. FLANNERY (SBN: 196266)<br>**CUNEO GILBERT<br>FLANNERY & LADUCA, LLP**<br>Two CityPlace Drive<br>St. Louis, MO 63141<br>Telephone: (314) 226-1015<br>mflannery@cuneolaw.com |
| | MATTHEW J. PLATKIN (*pro hac vice*)<br>AARON HAIER (*pro hac vice*)<br>**PLATKIN LLP**<br>413 Washington Avenue, Unit 174<br>Belleville, NJ 07109<br>Telephone: (973) 561-1951<br>mplatkin@platkinllp.com<br>ahaier@platkinllp.com |
| | *Attorneys for Plaintiffs<br>the Writers Guild of America, West, Inc., and<br>the Writers Guild of America East Inc.* |

PLS.' MOTION FOR A PRELIMINARY INJUNCTION,
Case No. 4:26-cv-07212